14-1754
Espinoza v. Dimon

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

_____

August Term, 2014

(Argued: April 1, 2015     Decided: August 12, 2015)

Docket No. 14-1754

_____

ERNESTO ESPINOZA, Derivatively on Behalf of JPMorgan Chase & Co.,

*Plaintiff-Appellant*,

—v.—

JAMES DIMON, DOUGLAS L. BRAUNSTEIN, MICHAEL J. CAVANAGH, ELLEN V. FUTTER, JAMES S. CROWN, DAVID M. COTE, LABAN P. JACKSON, JR., CRANDALL C. BOWLES, JAMES A. BELL, LEE R. RAYMOND, STEPHEN B. BURKE, WILLIAM C. WELDON, INA R. DREW, DAVID C. NOVAK,

*Defendants-Appellees*,

JPMORGAN CHASE & CO.,

*Nominal Defendant-Appellee*,

WILLIAM H. GRAY, III,

*Defendant*.

_____

B e f o r e:    KATZMANN, *Chief Judge*, POOLER and CARNEY, *Circuit Judges*.

_____

Appeal from the dismissal of a derivative action seeking to compel JPMorgan to take action against the corporate officers allegedly responsible for the recent "London Whale" trading losses, including several executives who disseminated misleading statements about those losses. At the outset, we revisit our precedents governing the proper standard of review for dismissals of derivative actions, and hold that such dismissals should be reviewed de novo. On de novo review, it remains unclear how Delaware law would treat a case where a shareholder challenges the scope of a board's investigation of his demand. We accordingly certify the legal question necessary to decide the merits of this case to the Delaware Supreme Court.

_____

> GEORGE C. AGUILAR (Jay N. Razzouk, *on the brief*), Robbins Arroyo LLP, San Diego, California; Thomas G. Amon, Law Offices of Thomas G. Amon, New York, New York, *for Plaintiff-Appellant*.
>
> RICHARD C. PEPPERMAN, II, Sullivan & Cromwell LLP, New York, New York (Daryl A. Libow, Christopher Michael Viapiano, Sullivan & Cromwell LLP, Washington, D.C., *on the brief*), *for Defendants-Appellees* James Dimon, Douglas L. Braunstein, Michael J. Cavanagh, Ina R. Drew, and *Nominal Defendant-Appellee* JPMorgan Chase & Co.
>
> Jonathan C. Dickey, Gibson, Dunn & Crutcher LLP, New York, New York, *for Defendants-Appellees* Ellen V. Futter, James S. Crown, David M. Cote, Laban P. Jackson, Jr., Crandall C. Bowles, James A. Bell, Lee R. Raymond, Stephen B. Burke, William C. Weldon, and David C. Novak.

_____

2

KATZMANN, *Chief Judge*:

This derivative action is one of many to arise out of the "London Whale" trading debacle, which cost JPMorgan Chase billions. Plaintiff-appellant Ernesto Espinoza, a JPMorgan shareholder, believes that JPMorgan has not done enough to go after those he deems responsible. Through this lawsuit, he challenges the decision of the JPMorgan board to reject his demand that JPMorgan take action against the alleged wrongdoers. Although a board's rejection of a shareholder demand is normally conclusive so long as that rejection was based on a reasonable investigation, here Espinoza contends that the board's investigation was unreasonably narrow. Specifically, Espinoza alleges that the board's investigation only looked into the underlying trading losses, but did not explore certain alleged misstatements that JPMorgan executives made about those losses. Espinoza asserts that these misstatements exposed JPMorgan to significant liability, and should have led the board to take action against the executives involved. The district court (Daniels, *J.*) dismissed Espinoza's complaint, finding that he had not pleaded facts showing that the JPMorgan Board of Directors had wrongfully refused the demand for action.

We write to address both the standard of review and the underlying merits of the case.[1] As to the standard of review, the law of our circuit has traditionally held that a district court's decision to dismiss a derivative action is reviewed only for abuse of discretion. But deferential review is not warranted: Reviewing the dismissal of a derivative action, as with the dismissal of any other sort of complaint, involves nothing more than reading the allegations in the complaint and deciding whether those allegations state a claim. Accordingly, we today revisit the standard of review and hold that dismissals of derivative actions are reviewed de novo.[2]

Reviewing this case under that de novo standard, we conclude that Delaware law is unclear on how to handle Espinoza's argument that the scope of the board's investigation was too narrow. Although several Delaware cases hold that a board has wide discretion about the procedures it uses when investigating a demand, no case addresses allegations that the substantive scope of an

---

[1] We previously issued an opinion reviewing this case for abuse of discretion, and affirming the dismissal under that deferential standard. On August 12, 2015, that opinion was withdrawn *sua sponte*, and this opinion now replaces it.

[2] This opinion has been circulated to all judges of the Court prior to filing.

investigation was too narrow. We therefore certify the legal question necessary to decide the merits to the Delaware Supreme Court.

## BACKGROUND

Because the district court disposed of this case on a motion to dismiss, we assume the truth of the allegations in the plaintiff's complaint for purposes of this appeal. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). The following recitation of facts is thus adopted from Espinoza's complaint.

### A. The London Whale

The London Whale story begins in JPMorgan's Chief Investment Office ("CIO"), which manages and invests the excess cash from JPMorgan's other businesses. J.A. 10. Before 2009, the CIO invested primarily in conservative securities, with the goal of limiting JPMorgan's exposure to structural risks such as shifts in interest rates or foreign-exchange rates. J.A. 29. Beginning in 2008 and 2009, however, Defendant-Appellee Jamie Dimon, the Chief Executive Officer of JPMorgan, began transforming the CIO from a conservative risk-management unit into a more aggressive proprietary-trading desk, with the aim of generating additional profit. J.A. 30.

5

Seeking to satisfy this new emphasis on profits, the CIO began taking riskier positions in synthetic credit derivatives. In particular, a group of London traders led by Bruno Iksil—later known by the *nom de finance* "the London Whale"—made larger and larger bets in these markets. J.A. 32–33. But when these bets began to sour, the CIO doubled down by investing even more money in risky derivatives in an attempt to shore up these investments. J.A. 33–34. To conceal the losses, JPMorgan modified its "Variance at Risk" ("VaR") model in a way that gave the misleading impression that JPMorgan's overall risk had stayed constant; an unmodified VaR model would have shown that JPMorgan's risk had in fact doubled. J.A. 35. The model's modification was overseen and approved by Dimon.

As losses mounted, the markets and the press began to catch wind of JPMorgan's troubles. On April 6, 2012, *Bloomberg* reported that the CIO's positions in the credit derivative market had become so large that they were driving price moves in that market. J.A. 36. Shortly thereafter, Dimon, along with Defendant-Appellee Douglas Braunstein, JPMorgan's then-Chief Financial Officer, held a conference call with analysts and investors to discuss JPMorgan's earnings for the

6

first quarter of 2012. During this conference call, Dimon and Braunstein repeatedly claimed that the CIO was conservatively investing in safe securities. J.A. 36–40. For example, Braunstein stated that "[w]e invest . . . in high grade, low-risk securities" and "[a]ll of [the CIO's investment] decisions are made on a very long-term basis . . . to keep the Company effectively balanced from a risk standpoint." J.A. 37–38. Similarly, Dimon characterized the mounting publicity over the CIO's losses as "a complete tempest in a teapot." J.A. 39.

But on May 10, 2012, JPMorgan was forced to reveal to investors the scale of the CIO's losses. J.A. 40. Dimon disclosed, for the first time, that JPMorgan had modified its VaR model to minimize the scale of the risks taken by the CIO. *Id.* Dimon acknowledged that the CIO's investments had been "flawed, complex, poorly reviewed, poorly executed, and poorly monitored." J.A. 41. After all the dust settled, JPMorgan divulged that its total losses from the CIO exceeded $6.25 billion. J.A. 42. The debacle prompted a number of regulatory and Congressional investigations into JPMorgan's inadequate oversight of the CIO. J.A. 45–49.

## B. Espinoza's Demand and the Board's Investigation

On May 23, 2012, Espinoza, a shareholder of JPMorgan, sent a letter to the JPMorgan Board of Directors demanding that the Board investigate the London Whale debacle. J.A. 51. This demand asked the Board to investigate (1) the failure of JPMorgan's risk-management policies, (2) the dissemination of false or misleading information about the scandal, and (3) the extent to which JPMorgan had repurchased stock at inflated prices due to the failure to disclose the losses. J.A. 69. Espinoza also demanded that, following the investigation, JPMorgan sue the responsible individuals and claw back previously-awarded salary and bonuses. J.A. 69–70. Espinoza also demanded that JPMorgan improve corporate governance and implement better risk controls. J.A. 70.

In response to Espinoza's demand, which was joined by similar demands from other JPMorgan shareholders, the JPMorgan Board established a "Review Committee" composed of Defendants-Appellees Laban Jackson, Jr., Lee Raymond, and William Weldon, all members of the Board. J.A. 52–53. This committee would oversee JPMorgan's internal "Management Task Force," which had been assembled to investigate the London Whale debacle, and consider what

actions, if any, JPMorgan should take in response. J.A. 53. The task force was led by Defendant-Appellee Michael Cavanagh. J.A. 54.

The Board rejected Espinoza's demand by letter dated February 5, 2013. J.A. 83–86. The letter outlined the Review Committee and task force's extensive investigation, which included (1) 22 interviews of current and former JPMorgan employees, (2) a review of roughly 300,000 documents, (3) meetings with regulators, (4) an analysis of relevant news reports, and (5) a survey of industry best practices. J.A. 83–84. The Board stated that, in its judgment, further litigation was not in the best interests of JPMorgan. J.A. 86. In support of this conclusion, the letter identified various remedial measures that had already been taken, including a revamp of the CIO leadership and mandate, improved risk controls, reduced salary for certain senior management and CIO personnel, clawbacks of previously awarded bonuses, and the departure or reassignment of certain individuals involved in the debacle. J.A. 85. The Board also cited various factors that it weighed in deciding to not pursue litigation, including the cost of litigation, the low likelihood of success, the cost of bogging employees down in lawsuits, and the effect on employee morale. J.A. 85–86.

Espinoza then filed this lawsuit, arguing that his demand had been wrongfully refused. On March 31, 2014, the district court dismissed the complaint for failure to state a claim because the complaint did not show that the Board had failed to exercise appropriate business judgment in rejecting the demand. *See Espinoza v. Dimon*, No. 13-cv-2358, 2014 WL 1303507, at *7 (S.D.N.Y. Mar. 31, 2014). Although Espinoza asked for leave to amend if his complaint were dismissed, the district court did not grant leave to amend and instead entered judgment for the defendants immediately. *See id.*; Special App. 12–13.

## LEGAL FRAMEWORK

### I. Derivative Lawsuits

"The derivative form of action permits an individual shareholder to bring 'suit to enforce a corporate cause of action against officers, directors, and third parties.'" *Kamen v. Kemper Fin. Servs., Inc.,* 500 U.S. 90, 95 (1991) (quoting *Ross v. Bernhard,* 396 U.S. 531, 534 (1970)) (emphasis omitted). "Devised as a suit in equity, the purpose of the derivative action [is] to place in the hands of the individual shareholder a means to protect the interests of the corporation from

10

the misfeasance and malfeasance of 'faithless directors and managers.'" *Id.* (quoting *Cohen v. Beneficial Loan Corp.*, 337 U.S. 541, 548 (1949)).

"[A] shareholder seeking to assert a claim on behalf of the corporation must first exhaust intracorporate remedies by making a demand on the directors to obtain the action desired." *Scalisi v. Fund Asset Mgmt., L.P.*, 380 F.3d 133, 138 (2d Cir. 2004) (internal quotation marks omitted). If the board refuses the shareholder's demand, the derivative suit may proceed only if the shareholder shows that the board's refusal was "wrongful." *Abramowitz v. Posner*, 672 F.2d 1025, 1030 (2d Cir. 1982). Accordingly, Rule 23.1 of the Federal Rules of Civil Procedure requires a complaint in a derivative action to "state with particularity . . . any effort by the plaintiff to obtain the desired action from the directors or comparable authority and, if necessary, from the shareholders or members; and . . . the reasons for not obtaining the action or not making the effort." Fed. R. Civ. P. 23.1(b)(3). Although Rule 23.1 sets forth the pleading standard for federal court, the substance of the demand requirement is a function of state law—here, Delaware law. *See RCM Sec. Fund, Inc. v. Stanton*, 928 F.2d 1318, 1326 (2d Cir. 1991).

11

Under Delaware law, these allegations of wrongful refusal are reviewed under the business-judgment rule, which creates "a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000). Importantly, "[t]he ultimate conclusion of the [board] . . . is *not* subject to judicial review." *Spiegel v. Buntrock*, 571 A.2d 767, 778 (Del. 1990) (ellipsis in original) (quoting *Zapata Corp. v. Maldonado*, 430 A.2d 779, 787 (Del. 1981)). Instead, when evaluating wrongful refusal, "[t]he issues are solely the good faith and the reasonableness of the committee's investigation." *Id.* "[F]ew, if any, plaintiffs surmount [the] obstacle" of rebutting the presumption created by the business-judgment rule and showing that a demand was wrongfully refused. *RCM Sec. Fund, Inc.*, 928 F.2d at 1328.

## II.    Standard of Review

Ordinarily, we review dismissals de novo. *See, e.g.*, *Muto v. CBS Corp.*, 668 F.3d 53, 56 (2d Cir. 2012). But traditionally, there has been an exception to this general rule for derivative actions. In our Circuit, a line of cases dating back more

12

than three decades has "held that determination of the sufficiency of allegations [under Rule 23.1] depends on the circumstances of the individual case and is within the discretion of the district court . . . [and] [c]onsequently, our standard of review is abuse of discretion." *Kaster v. Modification Sys., Inc.*, 731 F.2d 1014, 1018 (2d Cir. 1984); *see also Lewis v. Graves*, 701 F.2d 245, 248 (2d Cir. 1983) ("[T]he decision as to whether a plaintiff's allegations of futility are sufficient to excuse demand depends on the particular facts of each case and lies within the discretion of the district court."); *Elfenbein v. Gulf & W. Indus., Inc.*, 590 F.2d 445, 450–51 (2d Cir. 1978) (per curiam). The holding of these older cases has been reiterated several times by more recent decisions. *See Halebian v. Berv*, 590 F.3d 195, 203 (2d Cir. 2009); *Scalisi*, 380 F.3d at 137.

Over the past few years, however, numerous courts have expressed doubts about the wisdom of reviewing Rule 23.1 dismissals for abuse of discretion rather than de novo. Seeing no reason to treat derivative actions differently than any other dismissed case, the First and Seventh Circuits recently adopted a de novo standard. *See Unión de Empleados de Muelles de Puerto Rico PRSSA Welfare Plan v.*

13

*UBS Fin. Servs. Inc. of Puerto Rico*, 704 F.3d 155, 162 (1st Cir. 2013)[3]; *Westmoreland Cnty. Emp. Ret. Sys. v. Parkinson*, 727 F.3d 719, 724–25 (7th Cir. 2013). Judges in the Ninth and District of Columbia Circuits, although bound to abuse-of-discretion review by their precedents, have both questioned the wisdom of deferential review in this context. *See Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust ex rel. Fed. Nat'l Mortg. Ass'n v. Raines*, 534 F.3d 779, 783 n.2 (D.C. Cir. 2008) (Kavanaugh, *J.*) ("We tend to agree with plaintiffs that an abuse-of-discretion standard may not be logical in this kind of case . . . because the question whether demand is excused turns on the sufficiency of the complaint's allegations; and the legal sufficiency of a complaint's allegations is a question of law we typically review de novo."); *Rosenbloom v. Pyott*, 765 F.3d 1137, 1159–60 (9th Cir. 2014) (Reinhardt, *J.*, specially concurring). The Delaware Supreme Court, known for its corporate law jurisprudence, expressly discarded abuse-of-discretion review of dismissals under the substantively identical Delaware Chancery Court Rule 23.1.

---

[3] The Supreme Court granted certiorari in *Unión de Empleados* to resolve the circuit split over the proper standard of review, *see* 133 S. Ct. 2857 (2013), but dismissed the case after the parties settled, *see* 134 S. Ct. 40 (2013).

*See Brehm*, 746 A.2d at 253–54 (Del. 2000).[4] Last but not least, several decisions in

our Circuit have voiced puzzlement over the abuse-of-discretion holdings of

*Kaster*, *Lewis*, and *Elfenbein*. *See Scalisi*, 380 F.3d at 137 n.6; *see also Gamoran v.*

*Neuberger Berman LLC*, 536 F. App'x 155, 157 (2d Cir. 2013); *Kautz v. Sugarman*, 456

F. App'x 16, 18 (2d Cir. 2011).

We are persuaded by the reasoning of those courts that have chosen to

review these dismissals de novo. In reviewing the dismissal of a derivative claim,

an appellate court performs exactly the same task as when reviewing the

dismissal of any other action: the court reads the facts alleged in the complaint,

assumes the truth of those facts, and decides whether those facts state a claim

under the applicable legal standard. No evidence is considered, no credibility

determinations are made, and none of the other usual justifications for deferring

to a district court are in play. Or, as the Delaware Supreme Court put it in *Brehm*:

> The nature of our analysis of a complaint in a derivative suit is the
> same as that applied by the [lower court] in making its decision in
> the first instance[:] . . . this Court[] is merely reading the English
> language of a pleading and applying to that pleading statutes, case

---

[4] Following Delaware's *Brehm* decision, several other state courts have also endorsed de novo review of dismissals of derivative actions. *See, e.g.*, *In re PSE & G S'holder Litig.*, 801 A.2d 295, 313 (N.J. 2002); *Harhen v. Brown*, 730 N.E.2d 859, 866 (Mass. 2000).

15

> law and Rule 23.1 requirements. To that extent, our scope of review is analogous to that accorded a ruling under Rule 12(b)(6).

746 A.2d at 253–54 (footnotes omitted)[5]; *see also* Pierre N. Leval, *Judging Under the Constitution: Dicta About Dicta*, 81 N.Y.U. L. Rev. 1249, 1273 (2006) (explaining that our abuse-of-discretion precedents are "surely wrong" because "[i]t cannot be a matter of a district judge's discretion whether a complaint is legally sufficient to state a claim").

And while it is surely true that, as the defendants point out in their brief, the sufficiency of a complaint's demand allegations will "depend[] on the particular facts of each case," *Lewis*, 701 F.2d at 248, that alone is not enough to justify deferential review. Many other legal questions turn on the specific context of a given case, and yet they remain purely legal questions subject to de novo review. For example, when a district court dismisses a fraud claim for lacking the particularized allegations required by Fed. R. Civ. P. 9(b), we review that dismissal de novo even though the adequacy of particularized allegations under Rule 9(b) is just as case- and context-specific as the adequacy of particularized

---

[5] Because so many derivative actions arise under Delaware law, we pay special heed to the Delaware Supreme Court's decision in *Brehm*. By aligning our standard of review with the standard used by the Delaware appellate courts, we minimize any "anomalies resulting from separate federal and state demand requirements." *RCM Sec. Fund, Inc.*, 928 F.2d at 1329.

demand allegations under Rule 23.1. *See, e.g.*, *S.Q.K.F.C., Inc. v. Bell Atl. TriCon Leasing Corp.*, 84 F.3d 629, 633 (2d Cir. 1996).

Accordingly, we discard the deferential standard articulated by *Kaster*, *Lewis*, and *Elfenbein*, and hold that dismissals under Rule 23.1 are reviewed de novo.[6] In reaching this conclusion, we further note that the defendants conceded at oral argument that, were we writing on a blank slate, it would make sense for dismissals under Rule 23.1 to be reviewed de novo.[7]

## DISCUSSION

At its heart, this suit challenges the scope of JPMorgan's investigation into the London Whale debacle. Espinoza's demand letter asked the JPMorgan Board to investigate and take action based on two related facets of the London Whale fiasco: (1) the underlying trading losses, which cost JPMorgan billions, and (2) the alleged dissemination of misleading statements by Dimon and others. Espinoza concedes that the Board adequately investigated the underlying trading losses,

---

[6] As already noted, this opinion has been circulated to all the judges of this Court prior to filing.

[7] *See* Appellee Oral Arg. at 1:13:08-17 ("Candidly, if I was examining the question from first principles as your honor's question suggests I would apply a de novo standard of review . . . .").

17

and although he disagrees with the Board's decision not to take more aggressive action against those responsible, he recognizes, as he must, that Delaware law protects the Board's decision so long as it was based on an adequate investigation.

But Espinoza does not concede that the Board adequately investigated the misleading statements. Both Espinoza's demand letter and his complaint attack public statements that minimized the scale of the London Whale losses, placing special focus on Dimon's statement in April 2012 that the media's attention to the losses was "a complete tempest in a teapot." J.A. 39. Espinoza alleges that these misstatements cost JPMorgan dearly, both by exposing JPMorgan to litigation and regulatory liability and by inflating the JPMorgan share price at a time when the corporation was repurchasing stock. Accordingly, Espinoza's demand letter requested that the Board "determine which Company employees, officers, and/or directors, current or former, were responsible for dissemination of the materially false/misleading statements and omissions regarding the risk exposure." J.A. 69.

Despite this demand, Espinoza contends that the Review Committee and task force's investigation focused solely on the substantive trading losses, rather than the misleading statements about those losses. For example, the complaint

18

alleges that "the Task Force did not investigate the improper statements discussed herein, which masked the CIO's troubled trading position and mounting losses from regulators and investors." J.A. 54; *see also* J.A. 56–57 ("[T]he Review Committee's investigation was limited in its scope. . . . [T]he Review Committee never even evaluated potential liability for certain of the defendants' false and misleading statements."). Consistent with this alleged failure to investigate the misstatements, the Board's response to Espinoza's demand letter makes no mention of the misstatements, and in fact characterizes the demand as solely "relating to the losses suffered by the Company's Chief Investment Office." J.A. 83.

Based on these allegations, Espinoza contends that the Board's decision to not go after Dimon and others is not entitled to the protection of the business judgment rule. Put simply, if the Board never investigated the misstatements, then there was never any exercise of "judgment" that could be presumed reasonable. *See Rich ex rel. Fuqi Int'l, Inc. v. Yu Kwai Chong*, 66 A.3d 963, 979 (Del. Ch. 2013) ("[T]he business judgment rule has no role where directors have either abdicated their functions, or absent a conscious decision, failed to act." (internal

19

quotation marks omitted)). As such, Espinoza urges that the Board's decision to not pursue action against Dimon or others was, contrary to the conclusion reached by the district court, unprotected by the business-judgment rule.

The district court rejected this argument, reasoning that "[n]either the Review Committee nor the Task Force was obligated to release a report that expressly addresses each and every issue raise[d] by [the] Plaintiff and the other shareholders who made demands on the Board." *Espinoza,* , 2014 WL 1303507, at *6. Accordingly, the district court concluded that Espinoza "has offered only conclusory allegations that the Review Committee's investigation, and the Board's subsequent refusal of Plaintiff's demand, rise to the level of 'gross negligence.'" *Id.* at *7.

We respectfully part ways with the able district court's analysis on this point. As an initial matter, we do not believe that Espinoza's allegations were "conclusory." To the contrary, the complaint asserts that the Board failed to investigate the misstatements or evaluate the liability that resulted from the misstatements. *See* J.A. 54, 56–57. Setting aside for the moment the question of whether this allegation states a claim, it is more than the "mere[] legal

20

conclusion[]" that the Supreme Court rejected as "conclusory" in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 557, 564 (2007). Instead, Espinoza's allegation has concrete "factual content," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), namely that the Board never investigated the misstatements. As with all cases, this allegation may or may not turn out to be factually accurate, and it may or may not prove legally sufficient, but we cannot say that Espinoza's allegations were "conclusory."

Moreover, under our newly-adopted de novo standard of review, we have some concerns about whether Delaware law clearly addresses how to handle Espinoza's challenge to the scope of the Board's investigation. The district court rejected Espinoza's argument about the scope of the Board's investigation based on a number of Delaware cases that stand for the proposition that boards have broad discretion in choosing how to respond to a shareholder demand. In *Levine v. Smith*, 591 A.2d 194, 214 (Del. 1991), *overruled on other grounds by Brehm*, 746 A.2d 244, for example, the Delaware Supreme Court rejected the contention that a "Board's failure to permit [the shareholder] to make an 'oral presentation' to the Board evidenced a lack of due care or unreasonable conduct." *Levine* explained

21

that although "a board of directors has a duty to act on an informed basis in responding to a demand . . . , there is obviously no prescribed procedure that a board must follow." *Id.*

Several Delaware intermediate appellate court cases also cited by the district court expound further on this principle that a board has wide latitude over how it chooses to investigate a demand. In *Mount Moriah Cemetery ex rel. Dun & Bradstreet Corp. v. Moritz*, 1991 WL 50149, at *2 (Del. Ch. Apr. 4, 1991), for example, the board refused a demand for legal action against executives that had exposed the corporation to liability for deceptive sales practices. The plaintiff challenged the board's refusal as wrongful, complaining (1) that the board "interviewed only those senior officers that plaintiff accused of wrongdoing and their immediate subordinates," (2) "did not contact a single customer, regional manager, salesperson or 'whistle blower,'" (3) "failed to review any documents created prior to 1985," and (4) did not "obtain expert assistance [or] investigat[e] general industry sales practices." *Id.* at *3. In an unpublished decision, the *Moritz* court rejected these complaints as insufficient to overcome the presumption of the business judgment rule, reasoning that:

> In any investigation, the choice of people to interview or documents to review is one on which reasonable minds may differ. . . . Inevitably, there will be potential witnesses, documents and other leads that the investigator will decide not to pursue. That decision will not be second guessed by this Court on the showing made here. Plaintiff's complaint establishes that the Special Committee's investigation spanned more than six months. During that time, plaintiff was asked to identify potential witnesses and there was a fairly regular exchange of correspondence as well as several meetings between counsel for plaintiff and counsel for the Special Committee. The Special Committee interviewed the charged parties and their immediate subordinates, reviewed over 167,000 pages of documents and compiled enough information to produce a 163 page Report. . . . The foregoing description of the Special Committee's investigation and the other information available to the D & B directors . . . thoroughly refutes any suggestion that the Special Committee's investigation was grossly negligent.

*Id.* at *4.

Similarly, in another unpublished decision, *Gatz v. Ponsoldt*, 2004 WL 3029868, at *5 (Del. Ch. Nov. 5, 2004), the court rejected allegations that a board's investigation was unreasonable because the board never issued a report following its investigation, reasoning that "there is no authority that suggests that Delaware law requires a formal 'report' as a matter of law . . . [a]nd the complaint contains no allegations to suggest that the failure to draft a report in this circumstance rendered the investigation inadequate." Finally, in a third unpublished decision, *Baron v. Siff*, 1997 WL 666973, at *3 (Del. Ch. Oct. 17, 1997), the court stated that a

23

board's response to a demand need not "contain a point-by-point response to all allegations in the demand letter." *See also Halpert Enters., Inc. v. Harrison*, 2008 WL 4585466, at *2 (2d Cir. Oct. 15, 2008) (summary order) ("An investigating board generally is under no obligation to make use of any particular investigative technique.").

But while we agree that these cases stand for the proposition that courts should not second-guess the procedures that a board uses when investigating a demand, that principle is of limited application here. The plaintiff does not challenge the procedures that the board used when investigating the alleged misstatements. Instead, Espinoza challenges the *scope* of the board's investigation; that is, he argues that that the board used no procedures, because the board did not investigate the misstatements at all. Because the allegation in this case—an allegation that we must accept as true—is that there was no investigation of the misstatements at all, Espinoza has placed this case in a very different posture than the cases cited by the district court, all of which involved investigations that looked into the substance of the shareholder's demand.

Unfortunately, Delaware law does not squarely address how to evaluate challenges to the scope of an investigation where a shareholder demands that a board look into two related yet distinct matters and the board investigates only one of those matters before refusing the entire demand. None of the parties have uncovered any on-point cases, and our own independent review likewise came up empty. At most, the general principles of Delaware corporate law provide some very broad guidance in evaluating Espinoza's "scope" argument. Delaware law requires that "to invoke the [business-judgment] rule's protection[,] directors have a duty to inform themselves, prior to making a business decision, of all material information reasonably available to them." *Aronson*, 473 A.2d at 812.

But this broad rule does not tell us much about how to handle allegations that the directors have fulfilled this duty with respect to certain aspects of the plaintiff's demand, but completely abdicated that same duty with respect to some other aspect of the demand. As a matter of simple common sense, it seems apparent that such allegations must sometimes amount to gross negligence. A board that bypasses the core of a shareholder's demand and instead focuses its entire investigation on some minor secondary aspect of the demand has surely

25

failed "to inform [itself] . . . of all material information reasonably available to them." *Id.* On the other hand, a board that canvasses the waterfront of a demand, but fails to touch on some minor allegation raised in a footnote of the shareholder's demand letter, cannot be said to have acted with gross negligence.

The allegations in this case lie somewhere between the two poles of this spectrum. As the district court found, the Board thoroughly investigated the trading losses, which were a major component of Espinoza's demand. Conversely, however, the Board ignored the misstatements, which were also a major, albeit perhaps secondary, component of that same demand. This case thus presents a classic line-drawing exercise. The line between a reasonable and unreasonable investigation—and thus between a properly and wrongfully-refused demand—must lie somewhere between a total failure to become informed on the one hand, *see Brehm*, 746 A.2d at 259, and on the other, a thorough investigation that did not touch on every topic the shareholder might have mentioned anywhere in her demand.

Drawing this line requires balancing the competing policy concerns that animate the wrongful refusal doctrine in the first place. There must be some limit

to a board's discretion about how to investigate a demand. Otherwise, a board could always reject even a meritorious demand simply by circumscribing its investigation to carefully avoid inquiring into any wrongdoing. By the same token, however, the board's autonomy and appropriate exercise of discretion must be respected. Otherwise, a shareholder could misuse the demand requirement by submitting a long list of complaints to the board without separating the wheat from the chaff, and then, after the board concludes its investigation, criticize the board for not undertaking a complete inquiry of every matter raised in the demand. Allowing shareholders to undertake such ex post maneuvers would be inconsistent with the "presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Aronson*, 473 A.2d at 812. Wherever the line is drawn between reasonable and unreasonable investigations, it must avoid the Scylla of unfettered board discretion on the one hand, and the Charybdis of shareholder-plaintiff gamesmanship on the other.

But as a federal court sitting in diversity, we are not in a position to draw such a line on behalf of Delaware. Although we normally strive to "carefully . . . predict how the highest court of the forum state would resolve . . . uncertainty or ambiguity" in state law, *Travelers Ins. Co. v. 633 Third Assocs.*, 14 F.3d 114, 119 (2d Cir. 1994), here we are unable to predict with any confidence how the Delaware courts would evaluate Espinoza's allegations.

Accordingly, we turn to the Delaware Supreme Court to assist us in resolving this case. *See* Del. R. S. Ct. 41(a)(ii) ("[A] Court of Appeals of the United States . . . may, on motion or *sua sponte*, certify to this Court for decision a question or questions of law . . . ."); *Nguyen v. Holder*, 743 F.3d 311, 317 (2d Cir. 2014) ("[W]here a rule reflects a judicially created doctrine that reflects policy considerations over time . . ., certification is particularly compelling." (internal quotation marks omitted)). We hereby CERTIFY the following question to the Delaware Supreme Court:

> If a shareholder demands that a board of directors investigate both an underlying wrongdoing and subsequent misstatements by corporate officers about that wrongdoing, what factors should a court consider in deciding whether the board acted in a grossly

negligent fashion by focusing its investigation solely on the underlying wrongdoing?

"Consistent with our usual practice, we do not intend to limit the scope of the [Delaware Supreme Court's] analysis through the formulation of our question, and we invite the [Court] to expand upon or alter this question as it should deem appropriate." *Nguyen*, 743 F.3d at 317 (internal quotation marks omitted). In particular, in certifying the legal question concerning which factors are relevant to determining whether a board's investigation was grossly negligent, *see* Del. R. S. Ct. 41(b)(i), we welcome any guidance the Delaware Supreme Court may wish to offer on how those factors should be balanced in a case such as this one.