*Fabula v. American Medical Response, Inc.*

# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

August Term, 2016

(Argued: February 27, 2017   Decided: July 27, 2017)

Docket No. 15-3930

UNITED STATES OF AMERICA, EX REL. RONALD I. CHORCHES AS TRUSTEE FOR THE BANKRUPTCY ESTATE OF PAUL FABULA, and PAUL FABULA,

*Plaintiffs-Appellants*,

— v. —

AMERICAN MEDICAL RESPONSE, INC.,

*Defendant-Appellee.*[*]

B e f o r e:

KATZMANN, *Chief Judge*, and LYNCH and CHIN, *Circuit Judges.*

Plaintiffs-appellants brought this action under the False Claims Act, 31 U.S.C. § 3729 *et seq.*, against defendant-appellee American Medical Response, Inc. ("AMR"), alleging (1) in a *qui tam* claim, that AMR made false statements and

---

[*] The Clerk of Court is directed to amend the official caption as set forth above.

submitted false claims to the government for reimbursement under the Medicare and Medicaid programs, and (2) in an individual claim, that AMR retaliated against plaintiff-appellant Paul Fabula for his refusal to falsify a document. The United States District Court for the District of Connecticut (Michael P. Shea, *Judge*) dismissed both claims. For the reasons that follow, the judgment of the district court is **VACATED** and the case is **REMANDED** for further proceedings consistent with this opinion.

---

JONATHAN M. LEVINE (David S. Golub, *on the brief*), Silver Golub & Teitell LLP, Stamford, CT, *for* Plaintiffs-Appellants.

PAMELA L. JOHNSTON, Foley & Lardner LLP, Los Angeles, CA (Lawrence M. Kraus, Foley & Lardner LLP, Boston, MA, *on the brief*), *for* Defendant-Appellee.

Jeffrey S. Bucholtz, Paul Alessio Mezzina, King & Spalding LLP, Washington, DC, and Kathryn Comerford Todd, Warren Postman, U.S. Chamber Litigation Center, Washington, DC. *for* Amicus Curiae The Chamber of Commerce of the United States of America in support of Defendant-Appellee.

---

GERARD E. LYNCH, *Circuit Judge*:

Plaintiffs-appellants brought this action under the False Claims Act ("FCA"), 31 U.S.C. § 3729 *et seq.*, against defendant-appellee American Medical Response, Inc. ("AMR"), alleging (1) in a *qui tam* claim, that AMR made false

statements and submitted false claims to the government for reimbursement under the Medicare and Medicaid programs, and (2) in an individual claim, that AMR retaliated against plaintiff-appellant Paul Fabula for his refusal to falsify a document. The *qui tam* claim is asserted by bankruptcy trustee Ronald I. Chorches for and on behalf of the United States of America and for the benefit of Fabula's bankruptcy estate. The retaliation claim is asserted by Fabula individually.

The United States District Court for the District of Connecticut (Michael P. Shea, *Judge*) dismissed both claims: the first on the ground that Chorches failed to allege with the specificity required by Federal Rule of Civil Procedure 9(b) that AMR submitted false claims to the government, and the second on the ground that Fabula's refusal to falsify a document to effectuate AMR's alleged scheme to submit false claims did not constitute protected activity under the FCA's anti-retaliation provision. After deciding, as preliminary matters, that the district court had jurisdiction over Chorches's *qui tam* claim and that Fabula did not abandon his retaliation claim, we conclude (1) that Chorches has pled the submission of false claims with sufficient particularity under Rule 9(b), as applied in the *qui tam* context; and (2) that Fabula's refusal to falsify a patient

3

report, under the circumstances of this case, qualifies as protected activity. Accordingly, we VACATE the judgment of the district court, and REMAND for further proceedings consistent with this opinion.

## BACKGROUND

The following facts are taken largely from the second and third amended complaints filed in this action (the "SAC" and the "TAC," respectively). As required when reviewing a motion to dismiss a complaint for failure to state a claim, we accept these facts as true for purposes of this opinion. *See O'Brien v. Nat'l Prop. Analysts Partners*, 936 F.2d 674, 676-77 (2d Cir. 1991).

From August 2010 to December 2011, Fabula worked as an Emergency Medical Technician ("EMT") in the New Haven, Connecticut branch office of AMR, the largest ambulance company in the United States. In February 2011, while he was employed at AMR, Fabula filed for Chapter 7 bankruptcy; he received a discharge of his debts in May 2011; and his bankruptcy case was closed in June 2011.

As an EMT, Fabula provided emergency and non-emergency medical transport services, some of which were reimbursable under Medicare and/or Medicaid. According to the complaints, AMR engaged in a scheme to

4

fraudulently obtain reimbursement from Medicare by falsely certifying ambulance transports as medically necessary and submitting claims that it knew were not properly reimbursable under the rules and regulations governing payments by Medicare.[1]

The execution of the alleged scheme was relatively straightforward. Medicare pays AMR only for ambulance transports that were "medically necessary," as explained in the Medicare Benefit Policy Manual. Medical necessity is established when the patient's condition is such that use of any other method of transportation is contraindicated (*i.e.*, inadvisable for the patient's health). Thus, in any case in which some means of transportation other than an ambulance can be used without endangering the individual's health, whether or not such other transportation is actually available, Medicare does not pay for ambulance services. Even when the services are deemed medically necessary, moreover, Medicare payments are based on the level of services furnished, not simply on the vehicle used. As a result, in order to receive reimbursement from

---

[1] Although the TAC alleges that AMR made false statements and submitted false claims for reimbursement under both the Medicare and Medicaid programs, the complaint details the scheme primarily vis-à-vis Medicare. For convenience, we refer only to Medicare in this opinion.

Medicare, AMR was required to review and submit information about the condition of patients and the emergency or non-emergency medical services that it had provided to them.

When AMR dispatched an ambulance to transport someone (in industry parlance, a "run"), the participating paramedics and/or EMTs were required to complete an electronic Patient Care Report ("PCR"). The PCRs documented information such as the date, time, and address of the pickup; the name of the person being transported; the name of the medical facility to which the person was transported; and a description of the condition of the person being transported. They were created electronically on a laptop computer during, or immediately following, a run. The description of the transported person's condition determines whether a run is treated as "medically necessary."

The TAC alleges that during the period of Fabula's employment, AMR routinely made its EMTs and paramedics revise or recreate their field-generated PCRs to include false statements purportedly demonstrating medical necessity to ensure that runs would be reimbursable by Medicare, whether or not ambulance service was in fact medically necessary in the particular case. AMR supervisors provided the EMTs and paramedics with printouts of their original PCRs

6

prepared at the time of the run, marked up with handwritten revisions that altered the substance of the original PCRs so as to falsely characterize runs as medically necessary. Supervisors at AMR specifically instructed EMTs and paramedics how to modify the PCRs by including false or misleading information, and admitted to Fabula that the purpose of such revisions was to qualify the run for Medicare reimbursement. The participation of the EMTs and paramedics in the revision of the PCRs was required because those employees had unique log-in passwords that allowed them to alter the PCRs and prevented AMR supervisors from revising the PCRs themselves. After the EMTs and paramedics had revised or recreated the original PCRs, AMR supervisors collected and shredded the printouts with the handwritten changes. The falsified electronic PCRs remained in AMR's database, to be used for billing purposes.

In addition to identifying several general categories of patients who were susceptible to having their runs falsely certified as medically necessary (for example, calm and cooperative dementia patients were routinely written up as having a history of violence), the TAC identifies more than ten specific runs for which Fabula was ordered to alter PCRs to include false or misleading

information.[2] A few examples follow.

On July 7, 2011, Fabula and paramedic William Shick transported several patients to the hospital in response to 911 calls. About two weeks later, Fabula was asked to revise four of the PCRs by adding information about the patients' previous surgeries and injuries, implying that such history made ambulance service medically necessary, even though one patient with a chronic allergy issue had no medical need for an ambulance but wanted a ride to the hospital because she thought she could avoid a wait at the hospital if she was brought in by an ambulance, and another patient called for an ambulance only because he felt that he should not have to buy his own cough syrup. On October 17, 2011, Fabula was in the midst of transporting a patient to the hospital, when the run was canceled when it was learned that it was not the correct date for the patient's medical appointment. Nevertheless, AMR made Fabula complete a "return trip PCR," as if the patient had been transported both to and from the hospital. TAC ¶ 101. On December 4, 2011, Fabula and Douglass Gladstone (also an EMT) assisted in transporting an obese patient who "had no medical reason to be sent to the

---

[2] In addition to PCRs, the TAC alleges that AMR also falsified Physician Certification Statements ("PCSs"), forms completed by physicians or registered nurses pursuant to Medicare regulations.

hospital, he simply wanted to go there." TAC ¶ 100. The patient was able to walk himself to the stretcher and climb on unassisted. An AMR supervisor instructed Fabula to insert information about the patient's previous surgeries to justify his transport to the hospital. That same patient called 911 six dozen times during 2011 for an ambulance to bring him to a medical facility to obtain insulin. AMR directed Fabula, under threat of being placed on unpaid leave, to state falsely in the PCRs for those runs that the patient had difficulty remaining in an upright position.

Another run in December 2011, in which Fabula assisted paramedic Kevin Bodiford, ultimately led to Fabula's effective termination by AMR.[3] For several weeks following the run, an AMR supervisor repeatedly instructed Bodiford, who had completed the original PCR (the "December 2011 PCR"), to revise his PCR so that it could be submitted to Medicare for payment. Bodiford refused to resubmit the PCR and told a supervisor that Fabula was responsible for the run. In February 2012, while Fabula was on medical leave, the supervisor contacted

---

[3] On an earlier occasion, Fabula had been suspended for a day for not completing three PCRs in the manner specified by supervisors, and was ultimately required to complete the forms with information provided to him by AMR in order to be allowed to return to work.

9

Fabula and "told [him] to return to AMR under the guise of recreating a PCR from a run made in early December of 2011 that [the supervisor] said had been lost." SAC ¶ 70. Fabula responded by email that he was uncomfortable with the request. Later that same month, when Fabula went to AMR's offices at the supervisor's direction, the supervisor told Fabula that "[y]ou should be able to complete the PCR with the information I've provided," SAC ¶ 72, and Fabula was handed the PCR that Bodiford had created as well as a cover sheet that included handwritten additions for Fabula to include in a new PCR. The addition of the handwritten information would have qualified the run for Medicare reimbursement. The words Fabula was instructed to use were not his, however; Fabula in fact did not even know what some of the words meant. No longer willing to participate in AMR's scheme, Fabula refused to falsify the PCR despite being told that "if he didn't include [the handwritten information] on the PCR, he couldn't come back to work." SAC ¶ 75. In a March 1, 2012 letter, AMR instructed Fabula "immediately to arrange a time for reconciliation and transmission of this [electronic PCR]. Failure to do so will result in corrective action up to and including termination." SAC ¶ 79. Because Fabula never returned to revise the PCR, his employment was effectively terminated.

10

On June 22, 2012, Fabula filed this action as a relator on behalf of the United States, which declined to intervene in 2013. The SAC asserted two claims: Count One alleged that AMR violated 31 U.S.C. § 3729(a)(1)(A) and (B) by making false statements and submitting false claims to the government, and Count Two alleged that AMR fired Fabula in retaliation for his efforts to stop the submission of a false claim in violation of 31 U.S.C. § 3730(h). On March 4, 2015, the district court dismissed the retaliation claim with prejudice for failure to state a claim, holding that Fabula's refusal to falsify a PCR did not constitute protected activity. It also dismissed the *qui tam* claim on standing grounds, because the *qui tam* claim, which pre-dated Fabula's bankruptcy petition, had become the property of his bankruptcy estate. The district court stayed the dismissal of the *qui tam* claim, however, to give Chorches, the trustee of Fabula's bankruptcy estate, the opportunity to intervene and pursue that claim. Subsequently, Chorches joined the action and filed the TAC, which pled only the *qui tam* claim. On November 6, 2015, the district court dismissed the TAC with prejudice for failure to state a claim, holding that Chorches did not satisfy Rule 9(b)'s heightened pleading requirement. It entered its final judgment dismissing the case on November 10, 2015. Appellants timely appealed the district court's March

11

4 and November 6, 2015 rulings.

## DISCUSSION

"We review de novo the grant of a [Federal Rule of Civil Procedure] 12(b)(6) motion to dismiss for failure to state a claim, accepting all factual allegations as true and drawing all reasonable inferences in favor of the plaintiff." *Trs. of Upstate N.Y. Eng'rs. Pension Fund v. Ivy Asset Mgmt.*, 843 F.3d 561, 566 (2d Cir. 2016). The complaint must plead "enough facts to state a claim to relief that is plausible on its face," *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007), and must "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Appellants contend that the district court erred in dismissing the FCA *qui tam* and retaliation claims, as pled in the TAC and the SAC, respectively. For the reasons that follow, we vacate the district court's judgment and remand for further proceedings.

## I. The *Qui Tam* Claim Was Adequately Pled.

Chorches argues that the district court erred in dismissing the TAC for failure to comply with Rule 9(b). AMR not only challenges that position but also claims that we lack jurisdiction to consider Chorches's *qui tam* claim because the

12

district court did not have subject matter jurisdiction over that claim. AMR argues that because Chorches's allegations derive from claims made in Fabula's original complaint, they violate the FCA's public disclosure bar, which AMR contends is jurisdictional.

**A. The District Court Had Jurisdiction over the Trustee's Claim.**

Because "every federal appellate court has a special obligation to satisfy itself not only of its own jurisdiction, but also [of] that of the lower courts in a cause under review," *Arnold v. Lucks*, 392 F.3d 512, 517 (2d Cir. 2004) (internal quotation marks omitted), we begin by addressing AMR's threshold contention that the FCA's so-called "public disclosure bar" deprived the district court of jurisdiction over Chorches's *qui tam* claim.

The public disclosure bar provides that courts "shall dismiss an action or claim under [§ 3730] . . . if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed" in a federal action (amongst other avenues) "unless . . . the person bringing the action is an original source of the information." 31 U.S.C. § 3730(e)(4)(A). For the first time on appeal, AMR argues that because Chorches — the trustee of Fabula's bankruptcy estate, to which the *qui tam* claim belongs — raises the same *qui tam* claim that was

13

previously raised by Fabula, Chorches's claim should be dismissed for lack of subject matter jurisdiction.

Whether the public disclosure bar is jurisdictional matters in this case because of AMR's failure to raise this argument below. Ordinarily, we will not consider in the first instance arguments not raised in the district court. *In re Nortel Networks Corp. Secs. Litig.*, 539 F.3d 129, 132 (2d Cir. 2008). However, because parties may not, by stipulation or neglect, confer jurisdiction on the federal courts that was denied to us by Congress, we must address any question about our jurisdiction, whether or not it has been properly preserved by the party contesting jurisdiction — or indeed, whether or not any party raises the issue before us. *See Wynn v. AC Rochester*, 273 F.3d 153, 157 (2d Cir. 2001). Accordingly, we turn first to the jurisdictional question. Upon due consideration, we conclude that the FCA's public disclosure bar is nonjurisdictional, and that AMR has forfeited the public disclosure defense by failing to raise the argument in the district court.

Not every rule that disallows claims under certain conditions affects the jurisdiction of the district courts. To the contrary, the Supreme Court has warned against "profligate use of the term 'jurisdiction.'" *Sebelius v. Auburn Reg'l Med.*

14

*Ctr.*, 568 U.S. 145, 153 (2013). Courts must "inquire whether Congress has clearly stated that the rule is jurisdictional; absent such a clear statement, [the Supreme Court has] cautioned, courts should treat the restriction as nonjurisdictional in character." *Id.* (brackets and internal quotation marks omitted). "Under this test, a provision that does not speak in jurisdictional terms or refer in any way to the jurisdiction of the district courts will not be considered jurisdictional." *U.S. ex rel. Hayes v. Allstate Ins. Co.*, 853 F.3d 80, 86 (2d Cir. 2017) (internal quotation marks omitted). Rather, such rules are construed as denying a cause of action under the specified circumstances, and are subject to the normal rules for preserving nonjurisdictional arguments for appeal.

Our recent decision in *Hayes* is instructive. There, we held that the FCA's "first-to-file rule"[4] is not jurisdictional; instead, it "bears on the merits of whether a plaintiff has stated a claim." *Hayes*, 853 F.3d at 85. In so holding, we reasoned that the first-to-file bar did not speak in jurisdictional terms or refer in any way to the jurisdiction of the district courts, and stood "in sharp contrast to other provisions of the FCA that *do* explicitly invoke the jurisdiction of the district

---

[4] "When a person brings an action under [§ 3730], no person other than the Government may intervene or bring a related action based on the facts underlying the pending action." 31 U.S.C. § 3730(b)(5).

15

courts." *Id.* at 86 (emphasis in original).

The same rationale applies to the public disclosure bar at issue here. As elaborated in *Hayes,* "[b]ecause the FCA clearly states that *other* limitations on *qui tam* actions are jurisdictional, but does not clearly state" that the public disclosure bar is jurisdictional, we must treat the public disclosure bar "as nonjurisdictional in character." *Id.* (brackets and internal quotation marks omitted; emphasis in original). Indeed, the evidence that the public disclosure bar is not jurisdictional is especially strong. Not only does the public disclosure bar, like the first-to-file rule at issue in *Hayes,* not speak in jurisdictional terms (when other provisions of the FCA do) — the public disclosure rule *itself* was formerly written as a jurisdictional bar, but was amended in 2010 specifically to *delete* the jurisdictional language. Prior to 2010, the provision expressly denied jurisdiction, specifying that "*[n]o court shall have jurisdiction* over an action under [§ 3730] based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing . . . unless . . . the person bringing the action is an original source of the information." 31 U.S.C. § 3730(e)(4)(A) (2006) (emphasis added). But Congress eliminated the reference to "jurisdiction" when it amended the statute in 2010. Thus, when this action was filed in 2012, the public disclosure rule was

16

no longer jurisdictional in nature. That remains true today.

Therefore, we join the majority of our sister circuits that have addressed the issue in holding that the public disclosure bar is no longer jurisdictional. *See, e.g., U.S. ex rel. Advocates for Basic Legal Equality, Inc. v. U.S. Bank, N.A.*, 816 F.3d 428, 433 (6th Cir. 2016) (since the 2010 amendment, "[t]he public disclosure bar is no longer jurisdictional, as every other circuit to address the question has concluded."); *U.S. ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC*, 812 F.3d 294, 299-300 (3d Cir. 2016); *U.S. ex rel. May v. Purdue Pharma L.P.*, 737 F.3d 908, 916-17 (4th Cir. 2013). *But see United States ex rel. Sheet Metal Workers Int'l Ass'n, Local Union 20 v. Horning Investments, LLC*, 828 F.3d 587, 591 (7th Cir. 2016) ("It is true that claims that previously have been disclosed may be brought only in limited circumstances, see 31 U.S.C. § 3730(e)(4), and that this rule is jurisdictional."). Accordingly, because AMR failed to raise the public disclosure bar as an affirmative defense or in connection with its motion to dismiss below, its argument that Chorches's *qui tam* claim is barred by Fabula's earlier complaints in this action has not been preserved for appellate review.[5]

---

[5] We retain discretion, of course, to consider arguments that are raised for the first time on appeal, where such consideration is in the interest of justice. *See Gibeau v. Nellis*, 18 F.3d 107, 109 (2d Cir. 1994). No such injustice is apparent here,

17

**B. The *Qui Tam* Claim was Adequately Pled under Rule 9(b).**

We turn next to the merits of Chorches's appeal. "In reviewing a decision to dismiss a complaint on Rule 9(b) grounds, we assume the truth of [a plaintiff's] allegations." *O'Brien*, 936 F.2d at 676-77. The TAC alleges on information and belief that specific claims were submitted to Medicare for payment. The district court held, however, that the TAC fails to satisfy Rule 9(b) because it provides neither details, such as invoice numbers, invoice dates, and amounts billed or reimbursed, regarding actual requests for payment made to the government, nor a factual basis for its allegations that AMR submitted false claims. We

---

however. The public disclosure bar is intended to confine the right to bring *qui tam* actions to those who bring frauds against the public treasury to the attention of the government and the courts; no public purpose is served by allowing opportunistic outsiders to file suit based on allegations of fraud that have already been publicized in lawsuits by others. In this case, however, Chorches brings the *qui tam* claim not for his personal benefit but in his capacity as the trustee of Fabula's bankruptcy estate, which in turn is the successor in interest to Fabula's pre-petition claims. His claim is thus simply the continuation of claims originally brought by Fabula, who made allegations of fraud not previously disclosed by anyone else. If the suit is successful, moreover, Fabula will personally benefit, not only by having the moral satisfaction of seeing his debts repaid but also, if Chorches recovers an amount that exceeds the creditor's claims against the bankruptcy estate, by receiving any residual amount in the estate. We express no view as to whether, under these circumstances, the public disclosure bar should be held applicable if objection had been properly raised in the district court. We are confident, however, that no injustice results from permitting the trustee to proceed in these circumstances when the defendant failed to preserve the issue.

18

respectfully disagree.

The FCA is an anti-fraud statute that "may be enforced not just through litigation brought by the Government itself, but also through civil *qui tam* actions that are filed by private parties, called relators, 'in the name of the Government.'" *Kellogg Brown & Root Servs., Inc. v. U.S. ex rel. Carter*, 135 S. Ct. 1970, 1973 (2015), quoting 31 U.S.C. § 3730(b)(1). As relevant to Chorches's *qui tam* claim, the FCA imposes liability on any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" or who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(A), (B).[6] The FCA defines a "claim" as "any request or demand . . . for money or property" that is presented, directly or indirectly, to the United States. 31 U.S.C. § 3729(b)(2)(A).

*Qui tam* complaints filed under the FCA, because they are claims of fraud, are subject to Rule 9(b). *U.S. ex rel. Ladas v. Exelis, Inc.*, 824 F.3d 16, 26 (2d Cir.

---

[6] The district court dismissed the claim because of Chorches's failure to sufficiently plead the submission of a false claim. On appeal, AMR does not argue that any other element necessary for *qui tam* liability is lacking. Thus, we need not parse the other elements of either subsection.

2016); *Gold v. Morrison-Knudsen Co.*, 68 F.3d 1475, 1476-77 (2d Cir. 1995). Rule 9(b) states that "[i]n alleging fraud . . . , a party must state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). That ordinarily requires a complaint alleging fraud to "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Ladas*, 824 F.3d at 25 (internal quotation marks omitted). But "the adequacy of particularized allegations under Rule 9(b) is . . . case- and context-specific." *Espinoza ex rel. JPMorgan Chase & Co. v. Dimon*, 797 F.3d 229, 236 (2d Cir. 2015).

"Despite the generally rigid requirement [of Rule 9(b)], allegations may be based on information and belief when facts are peculiarly within the opposing party's knowledge." *Wexner v. First Manhattan Co.*, 902 F.2d 169, 172 (2d Cir. 1990). "Pleading on information and belief is a desirable and essential expedient when matters that are necessary to complete the statement of a claim are not within the knowledge of the plaintiff but he has sufficient data to justify interposing an allegation on the subject." 5C C. Wright et al., Fed. Prac. & Proc. § 1224 (3d ed. April 2017 Update). "Where pleading is permitted on information and belief" in a complaint that alleges fraud (and is therefore subject to Rule

20

9(b)), we require that the complaint "adduce specific facts supporting a strong inference of fraud." *Wexner*, 902 F.2d at 172.

AMR argues that Chorches has not satisfied Rule 9(b)'s heightened pleading requirements because he has not identified actual invoices that were submitted to the federal government. The TAC, however, adequately pleads — with specificity, albeit on information and belief — that fraudulent claims were submitted to Medicare.

### 1. The TAC Adequately Alleges that Billing Information was Peculiarly Within the Knowledge of AMR.

Chorches concedes that he cannot identify exact billing numbers, dates, or amounts for claims submitted to the government. However, the TAC sets forth facts establishing specific reasons why such information regarding the particular bills that were submitted for reimbursement is "peculiarly within [AMR's] knowledge." *Id*. According to the TAC, all ambulance personnel, including Fabula, "were prohibited from making unauthorized entrances into the administrative building of AMR in New Haven where all the billing was taking place," and other than "certify[ing] whether ambulance runs were medically necessary," they were not able to "participate[] in [AMR's] billing procedures."

21

TAC ¶ 115. In fact, EMTs and paramedics were restricted to the "'garage' and the 'window' where they punched in and punched out each day," so that any "information about AMR's submissions to Medicare . . . [was] not accessible by any paramedics or EMTs such as Fabula." *Id*.[7]

The billing procedures established by AMR thus (advertently or inadvertently) made it virtually impossible for most employees to have access to all of the information necessary to certify on personal knowledge both that a particular invoice was submitted for payment and that the facts stated to justify the invoice were false. The EMTs and paramedics who participated in the runs and wrote up the PCRs had knowledge of the facts recited regarding the runs (including any falsifications), which would be the basis for establishing whether the runs were eligible for Medicare reimbursement, but they had no access to the billing records establishing whether the runs with allegedly falsified records were in fact billed to Medicare. Conversely, the accounting personnel who presumably dealt with the billing and reimbursement processes knew which invoices were submitted to Medicare, but had access to PCRs (that the TAC

---

[7] The "garage" was AMR's office in New Haven, Connecticut where trucks and ambulances were kept when not in use.

22

alleges were deliberately falsified) only *after* the falsification was complete; therefore, they presumably were in a position to believe in good faith that, according to the information certified by the EMTs and paramedics, the submitted runs qualified for reimbursement.[8]

In light of those particular circumstances, which are based on specific factual allegations that *are* within Fabula's knowledge and that we must assume to be true for present purposes, Fabula (and hence Chorches) was unable, without the benefit of discovery, to provide billing details for claims that AMR submitted to the government for reimbursement. As a result, through no fault or lack of diligence on their part, plaintiffs lacked the ability to identify specific documents containing false claims that AMR submitted to the government. The TAC does, however, make plausible allegations that the bills or invoices actually submitted to the government were uniquely within AMR's knowledge and control. It therefore establishes a basis for concluding that allegations regarding the actual submission of bills may be made on information and belief. But, as noted above, even where a plaintiff has alleged facts sufficient to permit fraud to

---

[8] The TAC appears to identify only one managerial employee who both directed the falsification of PCRs and was later promoted to a position overseeing the billing quality control unit.

be pled on information and belief, the complaint must still "adduce specific facts supporting a strong inference of fraud." *Wexner*, 902 F.2d at 172.

> *2. The TAC Alleges a Basis for a Strong Inference that Specific False Claims Were Indeed Submitted to the Government.*

"[F]raud under the FCA has two components: the defendant must submit or cause the submission of a claim for payment to the government, and the claim for payment must itself be false or fraudulent." *U.S. ex rel. Hagerty v. Cyberonics, Inc.*, 844 F.3d 26, 31 (1st Cir. 2016). To begin with, there is little dispute that insofar as AMR's scheme of falsifying PCRs is concerned — as distinct from its subsequent submission of any claim for payment — the TAC "state[s] with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). Indeed, even in dismissing the TAC for failure to identify "with particularity any specific false claims that were actually submitted to the federal government for payment," the district court noted that "the TAC alleges, in some detail, a scheme of fraud, *i.e.* [AMR's] falsely completing PCRs." J.A. 309-10, n.6.

The TAC, over forty pages long, details the specifics of a scheme whereby AMR falsified PCRs so as to certify runs as "medically necessary" and thus render them reimbursable by the government. It names supervisory personnel at

24

AMR's offices in New Haven who instructed paramedics and EMTs to revise PCRs to insert false information. It identifies not only the time period of Fabula's employment, August 2010 to December 2011, as that during which the fraudulent scheme took place, but also provides dates, both precise and approximate, with respect to many particular runs for which Fabula was later asked to falsify a PCR. It explains both the scheme itself and the method by which AMR executed the scheme: how Medicare reimbursed AMR only for ambulance transports that qualified as medically necessary; how the EMTs and paramedics were required to complete PCRs to document their runs; and how AMR supervisors provided hard-copy markups (that were later destroyed) to the EMTs and paramedics and ordered them, under threat of suspension or termination, to revise field-generated PCRs with false or misleading information such that runs could be certified as medically necessary.

In addition to alleging that AMR falsified PCRs on a daily basis, and identifying the types of patients whose PCRs were routinely falsified, the TAC details many specific runs — providing information such as the date, patient name, and original reason for the transport — for which Fabula was told to alter a PCR with false or misleading information. These allegations are not merely

25

general or conclusory. Here, as an example, is one such allegation vis-à-vis a particular set of runs that Chorches claims, upon information and belief, was submitted to Medicare for reimbursement:

> [Patient name redacted] (now deceased) of [address redacted] in New Haven, was a grossly overweight man and a diabetic, and he called 911 for an ambulance on a daily basis — six dozen times during 2011 — to bring him to his medical facility — for his insulin. Paul Fabula was directed, under threat of being put on unpaid leave, to change and falsely certify the electronic entry of the PCRs in order to say that [patient] had difficulty remaining in an upright position in order to qualify [patient's] runs in the ambulance for Medicare/Medicaid reimbursement. Fabula did as he was ordered, and upon information and belief they were submitted to Medicare for payment.

TAC ¶ 108.[9]

---

[9] We note that it is easy to imagine innocent explanations for at least some of the alterations identified in the TAC. It is not a crime for a medical service provider to endeavor to make sure that its personnel omit no fact about a case that would legitimately render a particular service reimbursable by the patient's (governmental or private) insurer. Some such facts (such as those about a patient's history) might not be known by the ambulance personnel responsible for a particular run; other facts might be inadvertently omitted in field-generated reports because their significance to the billing process was not appreciated by an EMT or a paramedic whose principal concern was the immediate health and safety of the patient. Thus, whether discovery will support or refute the TAC's allegations cannot be known at this time. Nevertheless, the TAC directly and specifically alleges that at least some of the facts that Fabula was asked to insert were flatly false, and that other facts about the patient's history, while perhaps

Those allegations detail specific and plausible facts from which we may easily infer, for present purposes, that AMR systematically falsified its records to support false claims that ambulance runs were medically necessary and thus reimbursable. Such an inference of falsity is central to alleging the submission of false claims. As the Fifth Circuit has explained,

> [s]tanding alone, raw bills — even with numbers, dates, and amounts — are not fraud without an underlying scheme to submit the bills for unperformed or unnecessary work. It is the scheme in which particular circumstances constituting fraud may be found that make it highly likely the fraud was consummated through the presentment of false bills.

*U.S. ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 190 (5th Cir. 2009). Accordingly, Chorches has sufficiently pled the allegation, critical to stating an FCA *qui tam* claim, that records were in fact falsified.

He must *also* plead, however, that the false records were actually presented to the government for reimbursement. As noted above, although Chorches puts forth particularized allegations of a scheme to falsify records, and describes specific instances of the implementation of that scheme, he does not — and, for

---

literally true, did not provide an accurate reason for the run and were thus misleading. We must assume for present purposes that those allegations are true.

reasons set forth above, he cannot — allege on personal knowledge (of himself or of Fabula) that false claims were submitted to the government. We conclude, however, that the TAC sets forth facts supporting a strong inference that they were.

First, Chorches alleges that Fabula was explicitly "informed by [AMR supervisors who directed the scheme] that the revisions were required to qualify the run for Medicare reimbursement." TAC ¶ 33. Moreover, the TAC identifies specific instances in which AMR supervisors expressly asked for a PCR to be falsified in order to qualify a run for Medicare reimbursement. These allegations are hardly implausible, or even surprising, in light of the scheme of falsification that Chorches asserts (based on Fabula's personal knowledge) was effectuated by AMR. Indeed, it is difficult to conceive of a reason why AMR would go through the trouble of qualifying runs as medically necessary if not to claim reimbursement for them.

Thus, in alleging that supervisors specifically referenced Medicare as the provider to whose requirements the allegedly falsified revisions were intended to conform, the TAC supports a strong inference that false claims were submitted *to the government*. Moreover, in light of the significant share of runs that are

28

reimbursed by Medicare and Medicaid (as distinct from private insurance), it is highly likely that any systematic scheme for documenting fabricated medical necessity for ambulance services will indeed reach the governmental insurers.[10] While it can be hypothesized, as AMR indirectly suggests, that AMR falsified PCRs for runs that were "billed to payors other than Medicare, billed for a denial, or not billed at all," Appellee's Br. 50, any such conclusory defense of the underlying scheme is not persuasive at the pleading stage. If the allegations as to the falsification scheme are true, as we must assume at the pleading stage, it is highly implausible to suggest that the resulting records were never submitted to

---

[10] The TAC alleges that between 40% and 70% of AMR's business in New Haven during the period in question involved Medicare or Medicaid patients. This suggests that any systematic scheme for documenting fabricated medical necessity for ambulance services would indeed reach the governmental insurers. More fundamentally, regardless of the likelihood that any particular run would be billed to Medicare, the key issue is the likelihood that a run *associated with a falsified PCR* was billed to the government. The supervisors who asked Fabula to falsify PCRs specifically referenced Medicare, suggesting that the falsification of records may have been particularly necessary to secure reimbursement from federal insurance programs. We must take as true that the supervisors made these statements, and we see no basis, at the pleading stage, for failing to take the supervisors at their word that it was Medicare, rather than a private insurer, for which particular falsifications were generated.

the federal government for reimbursement.[11] Accordingly, AMR fails to diffuse

the strong inference that it submitted false claims to the government that arises

from the admissions allegedly made to Fabula by his supervisors at AMR that

Medicare was the specific target of the fabricated medical necessity claims that

the alleged scheme generated.

We are therefore satisfied that the TAC makes plausible and particularized

factual allegations leading to a strong inference that AMR did in fact submit false

claims to the government.

### 3. Permitting Pleading on Information and Belief on These Facts is Consistent with the Purposes of Rule 9(b) and of the False Claims Act.

In applying Rule 9(b) to the submission of false claims under subsections

3729(b)(2)(A) and (B) of the FCA, we decline to require that every *qui tam*

---

[11] Under analogous circumstances, our sister circuits have reasoned as we do here. *See Foglia v. Renal Ventures Mgmt., LLC*, 754 F.3d 153, 158 (3d Cir. 2014) ("While both scenarios are possible, it is unclear what would motivate the second, as it would expose [defendant] to possible sanctions for failure to comply with required procedures, and would not provide any financial incentive."); *Grubbs*, 565 F.3d at 192 (the particularized allegations "that specified, unprovided services were recorded amounts to more than probable, nigh likely, circumstantial evidence that the doctors' fraudulent records caused the hospital's billing system in due course to present fraudulent claims . . . . It would stretch the imagination to infer the inverse; that . . . they continually record unprovided services only for the scheme to deviate from the regular billing track at the last moment so that the recorded, but unprovided, services never get billed.").

complaint allege on personal knowledge specific identified false invoices submitted to the government. As set forth above, a complaint can satisfy Rule 9(b)'s particularity requirement by making plausible allegations creating a strong inference that specific false claims were submitted to the government and that the information that would permit further identification of those claims is peculiarly within the opposing party's knowledge.

That standard "must not be mistaken for license to base claims of fraud on speculation and conclusory allegations." *Wexner*, 902 F.2d at 172. A relator must make allegations that lead to a strong inference that specific claims were indeed submitted and also plead that the particulars of those claims were peculiarly within the opposing party's knowledge. Those requirements ensure that those who *can* identify examples of actual claims *must* do so at the pleading stage. *Cf. U.S. ex rel. Clausen v. Lab. Corp. of Am.*, 290 F.3d 1301, 1314 n.25 (11th Cir. 2002) (rejecting argument for a "more lenient pleading standard" where relator was "not without avenues for obtaining information" and his "conclusory statements [were] insufficient to justify relaxation").

The pleading standard we apply accords with the text of Rule 9(b), which requires "the circumstances constituting fraud" to be pleaded with particularity.

31

Our standard is also mindful of the purposes of both Rule 9(b) and the False

Claims Act. An interpretation of Rule 9(b) that requires *qui tam* plaintiffs to plead

billing details regarding the submission of specific false claims, even when

knowledge of such details is peculiarly within the defendant's purview, would

discourage the filing of meritorious *qui tam* suits that can expose fraud against

the government. Under that approach, by simply insulating its accounting

department from personnel with operational knowledge, a corporate fraudster

could ensure that few employee relators could successfully plead both the falsity

of recorded information and the presentment of a claim containing those

falsehoods. As in this case, the line workers who falsify paperwork or witness the

fraud could not show that claims were in fact submitted, while the accountants

who submit the claims would be unaware of the particulars of any falsification,

and perhaps to the entire scheme itself. It is not the purpose of Rule 9(b), as

applied to FCA *qui tam* actions, to render the FCA toothless as to particularly

clever fraudulent schemes. *See U.S. ex rel. Lusby v. Rolls-Royce Corp.*, 570 F.3d 849,

854 (7th Cir. 2009) (any requirement that the relator plead details regarding

billing packages "takes a big bite out of *qui tam* litigation"). Instead, Rule 9(b) is

"designed to provide a defendant with fair notice of a plaintiff's claim, to

safeguard a defendant's reputation from improvident charges of wrongdoing, and to protect a defendant against the institution of a strike suit." *Ladas*, 824 F.3d at 25 (internal quotation marks omitted). Allowing the complaint in this case to go forward does no violence to those purposes.

First, "it is the pleading of the circumstances of the alleged fraud with a certain amount of precision that serves [Rule 9(b)'s] purpose by apprising the defendant . . . of the nature of the claim and the acts or statements or failures to disclose relied upon by the plaintiff as constituting the fraud being charged." 5A C. Wright et al., Fed. Prac. & Proc. § 1297 (3d ed. April 2017 Update). "[T]he point of Rule 9(b) is to ensure that there is sufficient substance to the allegations to both afford the defendant the opportunity to prepare a response and to warrant further judicial process." *U.S. ex rel. Heath v. AT & T, Inc.*, 791 F.3d 112, 125 (D.C. Cir. 2015). As detailed above, the TAC provides ample details as to the nature of the alleged scheme, as well as to particular instances in which the scheme was, to the personal knowledge of the original relator, allegedly carried out.

While invoice numbers and the dates of their submission would undoubtedly have put AMR on notice of specific claims allegedly submitted to the government, so do details provided in the TAC (such as dates of runs, patient

names, actual reasons for the transport, and the information entered into PCRs)

with respect to specific runs for which false claims were allegedly submitted.

That level of notice is especially fair and adequate given that AMR — and not its

ambulance personnel — is "in possession of the most relevant records, such

as . . . internal billing records, with which to defend on the grounds that alleged

falsely-recorded services were not recorded [or] were not billed for." *Grubbs*, 565

F.3d at 191.[12]

Second, while we acknowledge that AMR's "reputation in the health field

is valuable and should not be easily tarnished," Appellee's Br. 38, that concern

does not inoculate AMR against *qui tam* liability under the FCA such that no

relator — even one who, as discussed in the preceding subsections, has overcome

our demanding Rule 9(b) pleading requirements — can survive Rule 12(b)(6)

dismissal. The allegations of fraud made by the TAC are sufficiently strong to

---

[12] Moreover, "[s]ubjecting *qui tam* relators to a per se rule requiring the identification of specific false claims" based on personal knowledge is not necessary in FCA *qui tam* cases to provide the government with information necessary to decide whether to intervene in the case, since the government "rarely if ever needs a relator's assistance to identify claims for payment that have been submitted to the United States. Rather, relators typically contribute to the government's enforcement efforts by bringing to light other information that shows those claims to be false." Br. for the United States as Amicus Curiae 16, *U.S. ex rel. Nathan v. Takeda Pharm. N. Am., Inc.*, 134 S. Ct. 1759 (2014).

justify further inquiry to determine whether AMR does or does not deserve an unblemished reputation for integrity, even without further particularization of the invoices or bills submitted to the government.

Third, the allegations in the TAC are also sufficiently robust to allay any fear of undermining Rule 9(b)'s purpose, cited by AMR, of preventing strike suits and the concomitant pressure to settle such suits due to the pressure of litigation costs. The TAC is not, as AMR claims, "an unjustified ticket to discovery" that is founded on "conclusory and insufficient allegations." Appellee's Br. 43; *see also Madonna v. United States*, 878 F.2d 62, 66 (2d Cir. 1989) ("One of the purposes of Rule 9(b) is to discourage the filing of complaints as a pretext for discovery of unknown wrongs." (internal quotation marks omitted)). To the contrary, by alleging with particularity AMR's scheme to falsify PCRs in order to qualify runs as medically necessary, and identifying particular cases in which that scheme was carried out, Fabula has "overcome the bar erected by Rule 9(b) to spurious charges or frivolous lawsuits." *Clausen*, 290 F.3d at 1317 (Barkett, *J.*, dissenting). Fabula's plausible and particularized allegations are amenable to a targeted discovery process that could lead to a swift resolution of the lawsuit, especially if

AMR has not committed the fraud alleged.[13]

Finally, it bears remembering what Rule 9(b) actually requires. The Rule provides that "[i]n alleging fraud . . . , a party must state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). The rule demands specificity, but unlike such substantive reforms as the Private Securities

---

[13] "[I]n all matters relating to discovery, the district court has broad discretion to limit discovery in a prudential and proportionate way." *EM Ltd. v. Republic of Argentina*, 695 F.3d 201, 207 (2d Cir. 2012). Thus, on remand, the district court has the power to tailor a discovery process that suits the case at hand. *See Grubbs*, 565 F.3d at 191 ("Rule 9(b) should not be made to shoulder all the burden of policing abusive discovery. Its balance draws upon the vigilant hand of the district court judge."). Where a *qui tam* relator identifies representative examples of false claims or, as here, makes allegations leading to a strong inference that specific false claims were submitted, defendants could initially be required to provide discovery only with respect to the cases identified in the complaint. If no genuine dispute of material fact is found to exist as to whether false claims were in fact submitted in that limited set of cases, the lawsuit would be at or near its end. *See id*. ("Discovery can be pointed and efficient, with a summary judgment following on the heels of the complaint if billing records discredit the complaint's particularized allegations."). If the initial inquiry produces evidence that seems to bear out the complaint's assertions, however, the door could be open to broader discovery without fear of subjecting an innocent defendant to burdensome and unjustified inquiries. *See* TAC ¶¶ 110, 114 (stating that false claims not specifically alleged "can be readily identified by, and from, the existence of multiple versions of electronic PCRs for any particular run that has been submitted to Medicare for payment"). We do not undertake to direct any particular approach to regulating discovery; that is left to the discretion of the district court. We note only that limitations on discovery to prevent open-ended, expensive fishing expeditions are plainly available.

Litigation Reform Act of 1995 (PSLRA), it does not elevate the standard of certainty that a pleading must attain beyond the ordinary level of plausibility.[14] Nor does it forbid pleading upon information and belief where, as here, the circumstances justify pleading on that basis. *See Wexner*, 902 F.2d at 172. Thus, as noted above, Rule 9(b) demands that the pleading specify (1) the fraudulent statements, (2) the speaker, (3) where and when the statements were made, and (4) why the statements were fraudulent. *See Ladas*, 824 F.3d at 25. The TAC amply satisfies that standard: (1) it contends that AMR falsely stated facts to make specific ambulance runs appear medically necessary when they were not, and explains the nature and significance of those falsified facts; (2) it identifies that the speaker was, broadly, AMR, and more specifically, Fabula or other identified EMTs or paramedics who were required by their supervisors to include such

---

[14] The PSLRA requires plaintiffs to state with particularity the facts evidencing scienter: "[T]he complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). But unlike Rule 9(b), which remains subject to the plausibility standard, under "the stricter demand [that] Congress sought to convey" in the PSLRA, "an inference of scienter must be more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007). Thus, our application of Rule 9(b) in the FCA *qui tam* context leaves unaffected our interpretation of § 78u–4(b)(2), or its application in future cases.

falsified facts; (3) it states that the statements were made in PCRs that were, on information and belief, submitted to Medicare or Medicaid for reimbursement on dates close in time to the dates of the specified runs within the limited time period during which Fabula knew of and participated in the scheme; and (4) it explains that the statements were fraudulent in that they asserted false facts warranting a false inference that the runs were medically necessary and thus eligible for Medicare reimbursement. Rule 9(b) requires nothing more.

In sum, the TAC satisfies Rule 9(b)'s particularity requirement as applied to FCA *qui tam* claims.

> *4. Our Holding in this Case Accords with the Emerging Consensus in our Sister Circuits, and is Fully Consistent with our own Precedents.*

We recently acknowledged — without taking any position of our own — a seeming "circuit split regarding whether, to satisfy Rule 9(b), an FCA relator alleging a fraudulent scheme must provide the details of specific examples of actual false claims presented to the government." *U.S. ex rel. Polansky v. Pfizer, Inc.*, 822 F.3d 613, 619 (2d Cir. 2016). On further consideration, we conclude that our holding today is consistent with the law as generally stated by a majority of our sister circuits, and that the reports of a circuit split are, like those prematurely

38

reporting Mark Twain's death, "greatly exaggerated." As the various Circuits have confronted different factual variations, differences in broad pronouncements in early cases have been refined in ways that suggest a case-by-case approach that is more consistent than might at first appear.

Our holding today is clearly consistent with the approach taken by the Third, Fifth, Seventh, Ninth, Tenth, and D.C. Circuits, which have overtly adopted a "more lenient" pleading standard. Those courts have allowed a complaint that does not allege the details of an actually submitted false claim to pass Rule 9(b) muster by "alleging particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." *Grubbs*, 565 F.3d at 190 (5th Cir. 2009); *U.S. ex rel. Lemmon v. Envirocare of Utah, Inc.*, 614 F.3d 1163, 1172 (10th Cir. 2010) (adopting *Grubbs* standard); *Ebeid ex rel. U.S. v. Lungwitz*, 616 F.3d 993, 998-99 (9th Cir. 2010) (same); *Foglia v. Renal Ventures Mgmt., LLC*, 754 F.3d 153, 156-57 (3d Cir. 2014) (same); *Heath*, 791 F.3d at 126 (D.C. Cir. 2015) (same); *cf. Lusby*, 570 F.3d at 854 (7th Cir. 2009) ("We don't think it essential for a relator to produce the invoices

(and accompanying representations) at the outset of the suit.").[15]

In arguable conflict, at least at first glance, are decisions from circuits that have professed to apply a "stricter" standard for pleading the submission of false claims. In *Clausen*, the Eleventh Circuit held that Rule 9(b)'s heightened pleading standard requires "some indicia of reliability . . . to support the allegation of *an actual false claim* for payment being made to the [g]overnment." 290 F.3d at 1311 (emphasis in original). The First, Fourth, and Sixth Circuits have relied on *Clausen* to require, broadly speaking, that a relator allege details identifying actual false claims submitted to the government.[16] Similarly, the Eighth Circuit has held that

---

[15] AMR argues that the TAC fails to satisfy even the relaxed pleading standard of *Grubbs*, *Lusby*, *Lemmon*, *Ebeid*, *Foglia*, and *Heath*. While each of those cases addresses a distinct (and hence potentially distinguishable) set of allegations, we find unpersuasive AMR's interpretation of their respective holdings. More importantly, we are neither bound by, nor do we adopt wholesale, either the announced pleading standard purportedly adopted in those cases or the particular results reached in each of them. We simply express our view that a complaint that satisfies *our* pleading standard also satisfies that of the Third, Fifth, Seventh, Ninth, Tenth, and D.C. Circuits, and that our analysis is broadly consistent with that of those courts.

[16] *See U.S. ex rel. Karvelas v. Melrose-Wakefield Hosp.*, 360 F.3d 220, 232-33 (1st Cir. 2004), abrogated on other grounds by *Allison Engine Co. v. U.S. ex rel. Sanders*, 553 U.S. 662 (2008) (adopting *Clausen* standard to hold that "a relator must provide details that identify particular false claims for payment that were submitted to the government," such as "details concerning the dates of the claims, the content of the forms or bills submitted, their identification numbers, the amount of

a relator's complaint does not satisfy Rule 9(b) where it "fails to identify even one example of an actual false claim submitted." *U.S. ex rel. Dunn v. N. Am. Mem'l Health Care*, 739 F.3d 417, 420 (8th Cir. 2014). However, the decisions from those Circuits are in fact more nuanced (as are those from the Circuits adopting a more "lenient" standard) and leave open unresolved possibilities such that any "split" between them and decisions from the more lenient circuits is not, we think, a sharp one.[17]

In any event, whether such a split can be identified in the broad language

money charged to the government"); *U.S. ex rel. Bledsoe v. Comty. Health Sys., Inc.*, 501 F.3d 493, 510 (6th Cir. 2007) (relying on *Clausen* and *Karvelas* to hold that "where a relator pleads a complex and far-reaching fraudulent scheme," he must also "provide[ ] examples of specific false claims submitted to the government"); *U.S. ex rel. Nathan v. Takeda Pharms. N.A.*, 707 F.3d 451, 456-58 (4th Cir. 2013) (adopting *Clausen* standard to hold that "when a defendant's actions, as alleged and as reasonably inferred from the allegations, could have led, but need not necessarily have led, to the submission of false claims, a relator must allege with particularity that specific false claims actually were presented to the government for payment." (emphasis omitted)).

[17] In a 2014 amicus brief submitted in response to a Supreme Court order inviting the Solicitor General to express the views of the United States on whether a relator must identify specific false claims submitted for payment, the government explained that while circuits "have reached inconsistent conclusions about the precise manner in which a *qui tam* relator may satisfy" Rule 9(b), it is not a "clearly defined" disagreement. Br. for the United States as Amicus Curiae 10, *Nathan*, 134 S. Ct. 1759.

of the cases is not particularly meaningful here. It is far from clear that Circuits

that have adopted the stricter pleading standard — but at the same time declined

to impose an ineluctable bright-line rule that *every* relator allege details of actual

claims submitted — would disagree with our decision in this case. Indeed, the

TAC includes some details regarding submitted claims that those Circuits have

identified as absent from insufficiently particularized complaints.

The Sixth Circuit, for example, in adopting the "stricter" pleading

standard, expressly noted that it did not "intend to foreclose the possibility of a

court relaxing this rule in circumstances where a relator demonstrates that he

cannot allege the specifics of actual false claims that in all likelihood exist, and the

reason that the relator cannot produce such allegations is not attributable to the

conduct of the relator." *U.S. ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 501 F.3d 493,

504 n.12 (6th Cir. 2007); *see also Chesbrough v. VPA, P.C.*, 655 F.3d 461, 471 (6th Cir.

2011) (leaving open a similar possibility).[18] The Sixth Circuit has recently

---

[18] Similarly, the Fourth Circuit did not consider its holding in *Nathan* to conflict
with that of cases adopting the more lenient pleading standard: "In contrast to
cases such as [*Grubbs*], [r]elator's claim does not involve an integrated scheme in
which presentment of a claim for payment was a necessary result." 707 F.3d at
460, 461 (rejecting relator's "assertion that, if a patient is insured under a
government program, [a court] reasonably may infer that any prescription the
patient received for an off-label use was filled and that a claim was presented to

suggested that "a relator may . . . survive a motion to dismiss by pleading specific facts based on her personal billing-related knowledge that support a strong inference that specific false claims were submitted for payment." *U.S. ex rel. Prather v. Brookdale Senior Living Communities, Inc.*, 838 F.3d 750, 773 (6th Cir. 2016). In doing so, it noted more generally that "[e]very circuit that has applied a heightened standard . . . has retreated from such a requirement in cases in which other detailed factual allegations support a strong inference that claims were submitted." *Id*. at 772. Furthermore, it appeared to recognize that in a situation in which "specific allegations of the defendant's fraudulent conduct necessarily led to the plausible inference that false claims were presented to the government," a plaintiff might survive a motion to dismiss. *Id*. (internal quotation marks omitted). Such allegations, as detailed above, are present in the instant case.

the government"). It is thus a considerable exaggeration to consider the Fourth Circuit to be in direct conflict with *Grubbs*. Moreover, the Fourth Circuit appears to have distinguished its holding in *Nathan* from a case such as the present one, in which plaintiffs have alleged the kind of "integrated scheme in which presentment of a claim for payment was a necessary result" that was not alleged in that case. *Id*. at 461. Furthermore, in dismissing the *qui tam* suit in *Nathan*, it distinguished a case permitting a relator to plead an adequate basis for an inference that false claims were submitted by noting that the relator in that case had pleaded "specific details of false claims," including, among these details, "the dates of the alleged violations" and "details of the purported violations." 707 F.3d at 457 n.6. Both of those types of allegations are present in the TAC.

Therefore, we fail to see how our holding can be construed as in conflict with the Sixth Circuit's precedents.

The standard in the Eleventh Circuit, the originator of the "strict" pleading standard deriving from *Clausen*, has itself evolved in the years following that decision into a "nuanced, case-by-case approach, [whereby] other means are available to present the required indicia of reliability that a false claim was actually submitted." *U.S. ex rel. Mastej v. Health Mgmt. Assocs., Inc.*, 591 F. App'x 693, 704 (11th Cir. 2014). Indeed, Chorches's allegations are analogous to those that the Eleventh Circuit, in yet another case, deemed "sufficient to explain why [a relator] believed [the defendant] submitted false or fraudulent claims for services rendered by nurse practitioners and physician assistants." *U.S. ex rel. Walker v. R&F Properties of Lake Cty., Inc.*, 433 F.3d 1349, 1360 (11th Cir. 2005) (where the relator — unlike *Clausen*'s "corporate outsider" who made speculative assertions but quite like Fabula — was a nurse practitioner in the defendant's employ whose conversation about billing practices with the office manager formed the basis for her belief that claims were actually submitted).[19]

---

[19] In a case where plaintiff "was able to plead personal, first-hand knowledge of [the] submission of false claims" given her managerial position, the Eighth Circuit held that "a relator can satisfy Rule 9(b) without pleading representative

Finally, "although [*Karvelas*] cites *Clausen* and formulates its own strict standard, the facts before it did not require the [First Circuit] to reach the question of whether all complaints alleging [an FCA] presentment claim must include details of specific bills." *Grubbs*, 565 F.3d at 187. Moreover, unlike the complaint dismissed in *Karvelas*, the TAC here contains many of the "details" that the First Circuit deemed relevant for purposes of "identify[ing] particular false claims for payment:" the supervisors involved in the fraudulent scheme, dates for several runs, and both the contents of PCRs for those runs and particular services for which the government was allegedly billed. *Karvelas*, 360 F.3d at 232; *see id*. at 232-35.[20] More recently, in a "qui tam action in which the defendant

_____

examples of false claims if the relator can otherwise plead the 'particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted.'" *U.S. ex rel. Thayer v. Planned Parenthood of the Heartland*, 765 F.3d 914, 917-18 (8th Cir. 2014), quoting *Grubbs*, 565 F.3d at 190; *cf. Ebeid*, 616 F.3d at 999 (declining to relax "traditional pleading standards for fraud under Rule 9(b)" where relator was an "outsider" because "the FCA is geared primarily to encourage insiders to disclose information necessary to prevent fraud").

[20] The Eighth Circuit has stated that a relator "must provide some representative examples of [defendant's] fraudulent conduct, specifying the time, place, and content of their acts and the identity of the actors." *Dunn*, 739 F.3d at 420, quoting *U.S. ex rel. Joshi v. St. Luke's Hosp., Inc.*, 441 F.3d 552, 557 (8th Cir. 2006). The TAC makes those types of allegations.

induced *third parties* to file false claims," the First Circuit adopted a "more flexible standard" such that "a relator could satisfy Rule 9(b) by providing factual or statistical evidence to strengthen the inference of fraud beyond possibility without necessarily providing details as to each false claim." *U.S. ex rel. Duxbury v. Ortho Biotech Prods., L.P.*, 579 F.3d 13, 29-30 (1st Cir. 2009) (internal quotation marks omitted; emphasis in original). Although Chorches alleges that AMR, and not a third party, submitted the false claims, the third-party rationale is persuasive where, as here, the complaint is "specific" and "systematic" in alleging the submission of false claims, and the billing department was effectively a separate entity to ambulance personnel who were barred from accessing it. *Hagerty*, 844 F.3d at 32.

In short, we do not view our interpretation of Rule 9(b) to be in conflict with that of our sister Circuits. Nor do we see our holding as adopting a "lenient" pleading standard.[21] We simply apply the basic rules of Rule 9(b) to a particular

---

[21] The district courts in this Circuit that have confronted this issue have tended to apply the "stricter" pleading standard, reasoning, for example, that "*Grubbs* would likely not be accepted as the law of this Circuit. *Clausen* and *Karvelas* are more consistent with decades of Second Circuit precedent." *U.S. ex rel. Corp. Compliance Assocs. v. N.Y. Soc'y. for the Relief of the Ruptured & Crippled, Maintaining the Hosp. for Special Surgery*, No. 07 Civ. 292, 2014 WL 3905742, at *15 (S.D.N.Y. Aug. 7, 2014). However, at least some of those courts have reached that

set of allegations.

For that reason, we reject AMR's citation of our opinion in *Ladas* as a decision "from this Court [that] is not supportive" of Chorches's position. Appellee's Br. 51. AMR's reliance on *Ladas* — which issued a week after *Polansky* and did not grapple with the issue of presentment that *Polansky* identified but ultimately left unresolved[22] — is misplaced. *Ladas* was an implied false certification case where the relator brought a *qui tam* claim alleging that certain devices were falsely certified as conforming to the terms of a procurement contract with the government. More specifically, he "alleged that required forms relating to quality assurance and payment were filed with the U.S. upon shipping, [falsely] certifying that listed items conform to contract." *Ladas*, 824

---

conclusion based on a misunderstanding that applying the *Grubbs* standard is tantamount to *not* applying Rule 9(b). In any event, the standard we apply in this case is distinguishable from that of *Grubbs*.

[22] The relator in *Polansky*, alleging that his former employer "improperly marketed [a drug] as appropriate for patients whose risk factors and cholesterol levels fall outside the National Cholesterol Education Program Guidelines," did not provide details of actual false claims presented to the government. 822 F.3d at 614. But because this Court affirmed the district court's dismissal of the claims on the basis that "the FDA's approval of [the drug] was not dependent upon compliance with the Guidelines," it did not need to, and elected not to, take a position on the issue of presentment. *Id.* at 614, 619.

F.3d at 26 (alterations and internal quotation marks omitted). "This, however,

[was] the [complaint's] only express reference to an allegedly false statement

made to the government by defendants in connection with a claim for payment."

*Id*. As a result, the Court held that the relator's complaint

> did not contain plausible allegations of fact that showed,
> as required for FCA purposes, that any claim for
> payment submitted by [defendants] was false or that
> any of the devices delivered to the government failed to
> meet [c]ontract specifications. [Also, the] district court
> found that the [complaint] does not include the specifics
> of any claims submitted . . . .

*Id*. at 27 (internal quotation marks omitted). Thus, the *Ladas* complaint, unlike the

TAC, failed to sufficiently plead the *falsity* of any submitted claims. Moreover,

that decision, like *Polansky*, did not address whether "an FCA relator alleging a

fraudulent scheme must provide the details of specific examples of actual false

claims presented to the government." *Polansky*, 822 F.3d at 619. Accordingly, our

holding in this case is fully consistent with *Ladas*.[23]

---

[23] Similarly, our disposition of *U.S. ex rel. Wood v. Applied Research Associates, Inc.*, 328 F. App'x 744 (2d Cir. 2008) (affirming the district court's dismissal of a *qui tam* claim) does not affect the outcome here. The allegations in this case are easily distinguishable from those in *Wood* (where, as in *Ladas*, an inference of falsity itself was wanting). Furthermore, unlike Chorches, the relator in *Wood* "d[id] not assert any facts that are peculiarly within the knowledge" of defendants such that he could make allegations based on information and belief. *Id*. at 747 n.1.

In conclusion, Rule 9(b) does not require that every *qui tam* complaint provide details of actual bills or invoices submitted to the government, so long as the relator makes plausible allegations, as Chorches does in the TAC, that lead to a strong inference that specific claims were indeed submitted and that information about the details of the claims submitted are peculiarly within the opposing party's knowledge. We therefore reverse the district court's dismissal of the *qui tam* claim asserted in the TAC.

## II. Fabula Has Adequately Stated a Retaliation Claim.

Fabula argues that the district court erred in holding that the SAC fails to state a claim for retaliation under § 3730(h) of the FCA. We agree.

### A. The Retaliation Claim Was Not Abandoned.

Before addressing the substance of the claim, we must first consider AMR's threshold argument that Fabula has "waived or abandoned his retaliation claim by failing to replead it in the TAC." Appellee's Br. 28. Understanding AMR's position requires a more detailed account of the procedural history in the district court. The SAC, filed by Fabula, pled both the *qui tam* and the retaliation claims against AMR.

In an opinion dated March 4, 2015, the district court held that Fabula lacked standing to bring the *qui tam* claim, which had become the property of his bankruptcy estate, but stayed dismissal to allow the trustee of the bankruptcy estate to be substituted as plaintiff to bring that claim. As to the retaliation claim, which it concluded Fabula did have standing to pursue, the court held that Fabula "has failed to state a claim for retaliation under the FCA" and it dismissed the claim "with prejudice." J.A. 209.[24] Subsequently, the district court granted trustee Chorches's motion to join the case as a plaintiff for purposes of asserting the *qui tam* claim on behalf of the bankruptcy estate, and, on April 3, 2015, issued a text order "allow[ing] Plaintiffs the opportunity to amend *both* counts of the second amended complaint." J.A. 10 (emphasis added). However, the TAC, which was filed by Chorches — and whose caption lists Chorches as the sole "[p]laintiff," "[b]ringing this action on behalf of" the U.S., Fabula's estate, and

---

[24] At that point, although the dismissal of the retaliation claim with prejudice was a final disposition of *that claim*, the order was an interlocutory order that was not immediately appealable, since it did not dispose of the entire case, allowing for the possibility, which indeed eventuated, that the case would continue to be litigated in the district court by the bankruptcy trustee. Nor was the substitution of the bankruptcy trustee for Fabula with respect to the *qui tam* case appealable by Fabula at that point. *Ashmore v. CGI Grp., Inc.*, —F.3d—, 2017 WL 2661595, at *3 (2d Cir. June 21, 2017).

50

Fabula (who retains a residual interest in his estate) — pled only the *qui tam*

claim. J.A. 330. Fabula did not file an amended version of his retaliation claim.

AMR does not dispute that the retaliation claim, which arose several

months after Fabula's bankruptcy case had been closed, belongs to Fabula

individually and not, like the *qui tam* claim, to his bankruptcy estate. Rather,

AMR contends, as it did below in support of its motion to dismiss the TAC, that

the district court's April 2015 text order giving plaintiffs the opportunity to

replead both counts modified its March 2015 with-prejudice dismissal of the

retaliation claim, and that Fabula's failure to replead his retaliation claim in the

TAC thus renders that claim abandoned. Although the district court did not

address the issue of abandonment in its November 6, 2015 decision dismissing

the TAC, it held that "[b]ecause Chorches makes no attempt [in the TAC] to

replead the retaliation claim, that claim is dismissed with prejudice." J.A. 293.

This Court has previously noted that "[a] dismissal with leave to amend is

ordinarily a non-appealable order, but an appeal may be pursued where the

plaintiff disclaims any intention to amend or where . . . the district court sets a

deadline for amending and the plaintiff does not amend within the deadline."

*Salmon v. Blesser*, 802 F.3d 249, 252 n.2 (2d Cir. 2015) (citation omitted). Therefore,

51

even assuming that the district court's April 2015 text order retroactively made its earlier dismissal of the retaliation claim a non-final order that is not ordinarily appealable, by neither joining Chorches in the TAC nor repleading the retaliation claim in a separate amended complaint of his own, Fabula rendered that "non-final order 'final' and appealable," *Slayton v. Am. Exp. Co.*, 460 F.3d 215, 224 (2d Cir. 2006), subject to appeal after a final judgment was entered in the case.[25]

Accordingly, the filing by Chorches of the TAC, which pleads the *qui tam* claim and undoubtedly superseded the SAC with respect to *that* claim, did not constitute an abandonment by Fabula of his entirely separate claim of retaliation against AMR. If Fabula believed that his retaliation claim was adequately pled in the SAC, he was fully entitled to stand on the allegations of the SAC, and to appeal the dismissal of that claim (when a final judgment was entered in the

---

[25] AMR's view, expressed at oral argument, that the TAC was brought by Fabula in addition to Chorches, is borne out neither by the TAC (as noted above in our account of the procedural history) nor by the record more broadly. *See* J.A. 293 ("On April 24, 2015, *Chorches* filed the TAC . . . ." (emphasis added)). However, even if AMR were correct, this Court has in the past not "require[d] repleading of a claim or defense that explicitly has been denied." *In re Crysen/Montenay Energy Co.*, 226 F.3d 160, 162 (2d Cir. 2000) (holding that failure to include an arbitration defense in the amended answers after being denied an initial motion to stay was not a waiver of the defense); *Brown v. Daikin Am. Inc.*, 756 F.3d 219, 223 n.1 (2d Cir. 2014).

case), rather than to attempt to replead his retaliation claim to the district court.

**B. Fabula Adequately Pled That He Engaged in Protected Activity.**

The FCA's anti-retaliation provision provides in relevant part that

> [a]ny employee . . . shall be entitled to all relief necessary to make that employee . . . whole, if that employee . . . is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee . . . in furtherance of an action under this section or other efforts to stop 1 or more violations of [the FCA].

31 U.S.C. § 3730(h)(1). The particularity requirement of Rule 9(b) does not apply to retaliation claims under the FCA. *See Weslowski v. Zugibe*, 626 F. App'x 20, 20 (2d Cir. 2015) (in reviewing the Rule 12(b)(6) dismissal of a § 3730(h) claim, stating, without mentioning Rule 9(b), that the complaint is to be construed "liberally" in accordance with *Twombly* and *Iqbal*); *accord*, *Smith v. Clark/Smoot/Russell*, 796 F.3d 424, 433 (4th Cir. 2015) (stating that FCA retaliation claims "need pass only [Federal Rule of Civil Procedure] 8(a)'s relatively low notice-pleadings muster – in contrast to Rule 9(b)'s specificity requirements"); *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1103 (9th Cir. 2008); *U.S. ex rel. Williams v. Martin-Baker Aircraft Co.*, 389 F.3d 1251, 1259 (D.C. Cir. 2004).

Although "[t]his Court has yet to articulate a test for deciding when a plaintiff has set forth a claim for retaliation under section 3730(h)," *Weslowski*, 626 F. App'x at 22, district courts in this Circuit, as well as our sister circuits, have generally required a plaintiff to show that (1) he engaged in activity protected under the statute, (2) the employer was aware of such activity, and (3) the employer took adverse action against him because he engaged in the protected activity.[26] In its March 2015 decision dismissing Fabula's retaliation claim, the district court considered only the first of the three elements outlined above and held that Fabula's "mere refusal to complete the PCR, without other affirmative acts to stop the alleged fraud, is not protected activity." J.A. 207. We respectfully disagree.

As relevant to Fabula's claim, § 3730(h) protects "lawful acts done by the employee . . . in furtherance of . . . efforts to stop 1 or more violations of [the FCA]." 31 U.S.C. § 3730(h)(1); *see also Townsend v. Bayer Corp.*, 774 F.3d 446, 459 (8th Cir. 2014). AMR does not contest that Fabula's refusal to falsify the PCR was

---

[26] *See, e.g.*, *United States v. Empire Educ. Corp.*, 959 F. Supp. 2d 248, 256 (N.D.N.Y. 2013); *U.S. ex rel. Sarafoglou v. Weil Med. Coll. of Cornell Univ.*, 451 F. Supp. 2d 613, 624 (S.D.N.Y. 2006); *U.S. ex rel. Bias v. Tangipahoa Par. Sch. Bd.*, 816 F.3d 315, 323 (5th Cir. 2016); *U.S. ex rel. Miller v. Weston Educ., Inc.*, 840 F.3d 494, 505 (8th Cir. 2016); *Clark/Smoot/Russell*, 796 F.3d at 433; *Mendiondo*, 521 F.3d at 1103.

54

a lawful act.[27] It argues, rather, that Fabula's refusal does not, without more, qualify as an effort to stop a fraudulent scheme. Based on the plain language of the FCA's anti-retaliation provision, we hold that Fabula's refusal to engage in the fraudulent scheme, which under the facts as pled was intended and reasonably could be expected to prevent the submission of a false claim to the government, can constitute protected activity under the statute.

As alleged, Fabula's "refus[al] to falsify the PCR as demanded by" his AMR supervisor, SAC ¶ 135, was plainly in furtherance of an effort to stop an FCA violation. To the extent AMR contends that Fabula's refusal does not rise to the level of an affirmative act, and so cannot constitute an "effort," that argument is refuted by the plain language of the statute. Consistent with the word's everyday use, Webster's relevantly defines "effort" as a "conscious exertion of physical or mental power." Webster's Third New International Dictionary, Unabridged (2002) ("Webster's"). Fabula did not simply omit, fail, or neglect to fill out the December 2011 PCR after being instructed to do so — he verbally refused to alter the document as requested by AMR and, despite AMR's threat of

---

[27] The district court "assume[d] without deciding that Mr. Fabula's allegation that he defied his boss's command to fill out the form constitutes a 'lawful act.'" J.A. 205. AMR does not contend otherwise.

termination, failed to subsequently "arrange a time for reconciliation and transmission of" that PCR. SAC ¶ 79.[28]

Nor is this a case of an employee simply declining to play a role in a corrupt scheme engaged in by his fellows. It may well be a reasonable interpretation of § 3730(h)(1) to hold that a doctor whose colleagues in a hospital or medical practice submit inflated Medicare claims for their own services does not engage in protected activity when she merely declines to submit inflated bills herself, while making no effort either to prevent others from doing so or to report their corruption. But that hypothetical — on which we express no final view — is not this case. While refusing to falsify a single PCR could not have put the brakes on AMR's fraudulent scheme as a whole, on the facts as pled, Fabula had reason to believe that his refusal to alter the December 2011 PCR — which paramedic

---

[28] For that reason, we respectfully disagree with the analysis of the District Court for the District of Columbia in *U.S. ex rel. Tran v. Computer Sciences Corp.*, 53 F. Supp. 3d 104, 136 (D.D.C. 2014), which the district court adopted in dismissing Fabula's claim. *Tran* held that the relator could not show that his alleged refusal to participate in a fraudulent pass-through scheme constituted "protected activity" sufficient to trigger the protections of § 3730(h) because with "rare exception, the mere refusal to participate in an allegedly unlawful scheme is neither an 'act[] done' nor an 'effort[]' taken, and such forbearance certainly does not equate with the kind of affirmative activity that the text of the statute conveys." 53 F. Supp. 3d at 136 (alterations in original).

Bodiford had refused to alter, leaving only Fabula (who was called in during sick leave for the precise purpose of altering the document) with the credentials to falsify it[29] — would make it difficult, or even impossible, for AMR to file a false claim for that particular run, thus preventing or hindering at least *one* violation of the FCA. *See* Webster's (in relevant part, defining "stop" as "to hinder or prevent the passage of," "to get in the way of," "to interrupt or prevent the continuance or occurrence of," and "to arrest the progress or motion of").[30] Thus, Fabula's refusal to falsify the December 2011 PCR so as to hinder the filing of a fraudulent claim in violation of the FCA constitutes protected activity under § 3730(h).[31]

Our conclusion, which is rooted in the plain text of the statute, is bolstered

[29] The SAC clearly implies that only the personnel (the paramedic and/or EMT) involved in the actual run were empowered to fill out, and later change, the PCR for any given run. *See* SAC ¶ 55, 57, 86. In fact, with respect to the December 2011 PCR, Fabula alleges that "the PCR form [that the supervisor] wanted Fabula to submit *had to have* Fabula's unique login and his electronic signature." SAC ¶ 73 (emphasis added).

[30] Indeed, the TAC expressly alleges that as a result of Fabula's refusal to falsify the December 2011 PCR, AMR was, in fact, thwarted in submitting a claim to Medicare for that run.

[31] Since we conclude that Fabula has adequately pled that his refusal was a "lawful act[ ] . . . in furtherance of . . . [an] effort[ ] to stop" an FCA violation, we need not, and do not, address whether his refusal also qualifies as protected activity on account of its being a "lawful act[ ] . . . in furtherance of an action under this section." 31 U.S.C. § 3730(h)(1).

by the anti-retaliation provision's drafting history as well as relevant policy

considerations. Prior to 2009, § 3730(h) provided a non-exclusive list of specific

"lawful acts" done in furtherance of an FCA action that protected an employee,

and it did not include the "other efforts to stop . . . violations" language that is

now part of the statute. That version read:

> Any employee who is discharged, [etc.] . . . by his or her
> employer because of lawful acts done by the employee
> on behalf of the employee or others in furtherance of an
> action under this section, including investigation for,
> initiation of, testimony for, or assistance in an action
> filed or to be filed under this section, shall be entitled to
> all relief necessary to make the employee whole.

31 U.S.C. § 3730(h) (2006). Thus, the 2009 amendment had the effect of

broadening the universe of protected conduct under § 3730(h), at least with

respect to "efforts to stop" FCA violations.[32] At least one of the authors of the

amendment, Congressman Howard L. Berman, contended that § 3730(h) was

amended "so that it is clear that it covers . . . retaliation against not only those

---

[32] A blackline comparison of the two versions helps elucidate this point: An
employee who is discharged, suspended, or threatened because of "lawful acts
done" by the employee "in furtherance of an action under this section, including
investigation for, initiation of, testimony for, or assistance in an action filed or to
be filed under this section, or other efforts to stop 1 or more violations of this
subchapter" is entitled to anti-retaliatory relief.

58

who actually file a qui tam action, but also against those who plan to file a qui tam that never gets filed, who blow the whistle internally or externally without the filing of a qui tam action, *or who refuse to participate in the wrongdoing.*" 155 Cong. Rec. E1295-03, 2009 WL 1544226, at *E1300 (emphasis added).[33]

Furthermore, interpreting the anti-retaliation provision to draw an arbitrary boundary between efforts that take the form of "internal reporting to a supervisor or company compliance department" and those that amount to "refusals to participate in the misconduct that leads to the false claims," *id.*, would make little policy sense. There is, at best, a hair's-breadth distinction between complaining internally that a practice is illegal under the FCA and advising a supervisor of one's refusal to engage in that illegal practice. The facts alleged in this case exemplify that point. Fabula, who admits to having falsified numerous PCRs during his employment with AMR, had been told by his supervisors that PCRs were altered in order to render otherwise non-

---

[33] Were the statute ambiguous, that statement would be of limited weight, since it is a part of extended remarks that Congressman Berman submitted on June 3, 2009, almost two weeks after the amendment became law as part of the Fraud Enforcement and Recovery Act of 2009 (FERA). In any event, since we need not rely on the legislative history to resolve any ambiguity in the statute, we note the remark only as an indication of what one sponsor intended.

reimbursable runs reimbursable by the government. Under such circumstances, Fabula's email and oral refusals to falsify the December 2011 PCR, and his statement to a supervisor who, according to the complaints, was involved in AMR's fraudulent scheme that he did not "feel comfortable" making the alterations, SAC ¶ 135, are functionally equivalent to raising the issue internally. Any line-drawing between the two, so as to qualify one but not the other as protected activity under § 3730(h), would raise concerns about arbitrariness and encourage the adoption of opaque or burdensome reporting mechanisms that would help FCA violators avoid liability. We therefore decline to interpret the FCA's anti-retaliation provision to exclude Fabula's conduct.

The district court, whose analysis AMR repeats on appeal, concluded that because Fabula's action did not take the form of "complaints to his employer's management or in-house counsel, reports to the media, or a reasoned explanation to his supervisors that what they were asking him to do violated the law and should cease," it did not constitute "an 'effort' to 'stop' . . . '[one] or more violations' of the FCA." J.A. 206 (alterations in original).[34] But that conclusion

---

[34] Following that same logic, the district court also concluded that "because there is no allegation that Mr. Fabula told his employer that what it was doing was illegal, there is no reason to think his 'lawful act' was designed to prompt an

60

both ignores the plain language of the FCA's anti-retaliation provision — which does not require any of those particular steps but broadly protects efforts to stop even a single violation of the FCA — and undermines, as a practical matter, its capacity to protect persons who assist in the discovery and prosecution of FCA violations.[35]

While further factual development may well fail to validate Fabula's claim of retaliation, we must construe the allegations of the complaint in his favor at the pleading stage. We conclude that, on the facts alleged, Fabula has adequately

---

examination of — let alone a change to — AMR's practices." J.A. 207. But § 3730(h) does not protect only efforts to prompt an investigation or to change a company's general practices; it protects an effort to prevent *even one violation* of the False Claims Act.

[35] Contrary to AMR's position, *Thomas v. ITT Educ. Servs., Inc.*, 517 F. App'x 259 (5th Cir. 2013), which held that a plaintiff who alleged that she was asked to falsify grades did not establish that she engaged in protected activity, does not support the district court's textual analysis of the anti-retaliation provision. *Thomas* is readily distinguishable on its facts. Unlike Fabula's detailed allegations regarding AMR's scheme to defraud the government, the plaintiff in *Thomas* failed to establish — post discovery, for purposes of summary judgment — that she had engaged in protected activity because, among other reasons, she "had no knowledge which of her students were receiving federal funds to attend ITT, . . . what effect a failing grade would have on a student's federal loans, or how many failing grades a student had to receive to lose federal loans," "was only aware of four grades that were changed, and those grades were changed after ITT terminated her," and "did not submit evidence that ITT forced her to change grades." 517 F. App'x at 263.

pled that his refusal to alter the December 2011 PCR satisfies the "protected activity" element of § 3730(h). We therefore vacate the district court's dismissal of the retaliation claim asserted in the SAC.[36]

## CONCLUSION

For the foregoing reasons, the judgment of the district court is VACATED, and the case is REMANDED for further proceedings consistent with this opinion.

---

[36] Although we acknowledge that Fabula has averred facts indicating that AMR was aware of his refusal to falsify the December 2011 PCR and that it threatened to terminate his employment based on that refusal, we leave it to the district court to consider in the first instance, if necessary, whether the SAC satisfies the second and third elements of a § 3730(h) claim.